Argued and submitted June 20, affirmed in part, reversed in part, and remanded November 7, Northwest Natural's reconsideration and Multnomah County's reconsideration denied December 21, 1984, Multnomah County's petition for review denied, Northwest Natural's petition for review allowed, February 26, 1985 (298 Or 773)

NORTHWEST NATURAL GAS CO. et al,
*Appellants,*

*v.*

CITY OF PORTLAND et al,
*Respondents,*
PORTLAND GENERAL ELECTRIC COMPANY,
*Appellant.*

(A8302-00967; CA A28765)

690 P2d 1099

Jacob Tanzer, Portland, argued the cause for appellants Northwest Natural Gas, Pacific Power & Light, Pacific Northwest Bell, and General Telephone Company of the Northwest. With him on the briefs was Ball, Janik & Novack, Portland.

Warren Hastings, Portland, argued the cause and filed the briefs for appellant Portland General Electric Co.

Christopher P. Thomas, City Attorney, Portland, argued the cause for respondent City of Portland. With him on the brief was Kathryn Beaumont Imperati, Portland.

Paul R. Meyer, Portland, argued the cause for the

respondents County of Multnomah and Tri-County Metropolitan Transportation District. With him on the brief were Susan G. Whitney, and Kobin & Meyer, Portland, and John Leahy, Multnomah County Counsel, Portland.

Before Richardson, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Over the past decade, as a result of a planning process involving governmental units and local citizens, the Banfield Transitway Project was chosen from among 30 alternative proposals as the solution to the transportation problems along the Banfield Freeway/Burnside Street Corridor in Multnomah County. The project involves improvements to the existing Banfield Freeway as well as the construction of a light rail transit system (LRT) owned and operated by Tri-County Metropolitan Transportation District (Tri-Met) to connect downtown Portland with Gresham. The construction necessitates extensive relocation of facilities within the public right-of-way of investor-owned utilities Northwest Natural Gas (NNG), Pacific Power and Light (PP&L), Pacific Northwest Bell (PNB), General Telephone (Gen Tel) and Portland General Electric (PGE) (hereinafter "Utilities").

This proceeding for declaratory relief arises from the dispute between the Utilities and Portland, Multnomah County, and Tri-Met (defendants)[1] as to who must pay for the costs of the relocation. The trial court found that Utilities must pay, and they appeal. We affirm in part and reverse in part.

Utilities locate their facilities in a public right-of-way at the sufferance of the government. Government can require the facilities to be moved when the public way is needed for a public use and, if it does, the Utilities have no automatic claim for a taking of their property because of the loss of the capital investment in their existing facilities. *See New Orleans Gaslight Co. v. Drainage Commission of N. O.,* 197 US 453, 458-59, 25 S Ct 471, 49 L Ed 831 (1904); *N. O. Gas Light Co. v. Louisiana Light Mfg. Co.,* 115 US 650, 6 S Ct 252, 29 L Ed 516 (1885).

In this case the Banfield Transitway Project is divided into four segments—Gresham, Multnomah County, Banfield and City of Portland, and not all Utilities nor all defendants are involved in every segment. Determination of the rights and liabilities involves consideration of common

---

[1] The claim was originally brought by NNG, PP&L, PNB and Gen Tel. Defendants added PGE as an additional counterclaim defendant. The Oregon Department of Transportation was also a defendant, but no appeal is taken in regard to the state.

law, franchise agreements, statutes, ordinances and a 1928 deed. The inquiry which arises in the analysis of all the legal relationships between the parties, apart from the 1928 deed, is whether the construction of LRT is a legitimate governmental activity.

We have considered the franchise agreements, ordinances and statutes briefed by the parties and find that they are inapplicable[2] or that they do not address the question of who must bear the cost of relocation[3] or that the language of the franchises and laws must be interpreted according to common law. Portland has granted a franchise to PP&L and a revocable license to PNB. Under the language of both, the Utilities must pay for relocation of facilities interfering with "public works." PGE and the city stipulated that any existing franchise agreement "expressly reserves to the City of Portland the full police power over such public streets." However, whether or not the installation of LRT is a "public work" or within the "police power" of Portland must be determined by common law. The parties agree that the franchise to NNG does not address relocation costs.

■■ We turn first then to the 1928 deed. The rights of PGE and PP&L on East Burnside and Burnside Court are governed by a 1928 deed from PGE's predecessor, Portland Electric Power Company, to the County. In 1982, PGE sold its facilities between 97th and 122nd Avenue on East Burnside to PP&L. In 1982, PP&L demanded and received from PGE a deed for the real property on which the poles are located.[4] Presently PGE has power lines on both sides of East Burnside and on Burnside Court. The lines and poles on East Burnside

---

[2] The county's Design and Construction Standards do not require the county to bear the costs in this situation. As the county points out, the relocations here are being ordered by the county and not by Tri-Met.

[3] The authority of Multnomah County to order relocation comes from ORS 758.010; the city's, from ORS 221.420. Both statutes are silent as to who must pay. Portland City Code Section 17.56.060 requires relocation at a utility's expense whenever required for a "public improvement." The question is whether LRT is a "public improvement."

[4] Defendants deny that PP&L has succeeded to easement rights for its facilities located between 97th and 122nd Avenue on East Burnside. Defendants claim that, because PGE did not use the easement for ten years in this area, the easement was abandoned. A granted easement is not abandoned because the owner did not use it, *see Hoffman v. Dorris,* 83 Or 625, 629, 163 P 972 (1917), and PP&L has succeeded to the rights of PGE.

between 97th and 122nd Avenues belong to PP&L, except for a transmission line across 97th Avenue into the Russellville substation that is owned by PGE. Between 122nd Avenue and the termination of Burnside Court, Gen Tel maintains wires with the permission of PGE.

■■ In 1928, the Portland Electric Power County deeded 67 tracts of land to the county for use as a public highway[5] and reserved an easement with the following language:

> "The above described property has heretofore been used by the Grantor as a right-of-way for railroad and electric transmission line purposes and it is expressly understood that the Grantor reserves from the operation of this deed the physical improvements constituting the said railroad and/or said transmission line. * * * [I]t is also understood that the Grantor will continue the maintenance and operation of said transmission lines over and upon said property and shall have the right to go upon and over said property for the purpose of constructing, maintaining and operating electric transmission lines thereon and thereover in such location as may be prescribed by the said County.

> "As part consideration of this deed, but not as a condition in any way affecting the title conveyed hereunder, the said County will:

> "* * * * *

> "(2)  Reimburse the Grantor for any expense that the Grantor may be reasonably put to by reason of any change in the present location of its existing transmission line as required by the County, and/or as may be reasonably necessary because of the construction, maintenance and operation of a public highway upon said property; provided, however, that if, prior to any required change as aforesaid in the location of said transmission line, or section thereof, the grantor shall, by reason of deterioration, destruction or similar cause, rebuild said transmission line, or any section thereof, with ten or more consecutive poles, the grantor will rebuild its said transmission line, or said section thereof, at its sole expense upon a location over said lands to be designated by the County for the building, construction and operation of a public highway upon said lands.

---

[5] PGE also argues that the deed sought to limit the use of East Burnside Street to a "public highway." We agree with the trial court that construction of a street railway does not create an additional servitude violating the deed.

The agreement thus requires the county to pay for relocation if the county forces a change in the existing line before the company rebuilds the line. After 1928, the company voluntarily relocated the existing line which had been constructed in 1913. On the north side of Burnside replacement took place in 1930 and 1934. On the south side the line was replaced in 1948. The company paid for the relocation. While we agree with the trial court that the deed agreement as to who would pay for relocation referred only to the line that existed in 1913, we disagree that, because the company voluntarily replaced that line, it is required to bear the expense of the present relocation.

The deed is silent as to who should bear the cost for later relocations required by the county. The county argues:

"The easement created by the 1928 deed simply gives the power company the right to have its transmission line somewhere within or upon the right-of-way. There is no right created as to a specific location for that transmission line. Any right to reimbursement under the 1928 deed would derive from the specific provisions in that deed regarding reimbursement, and there is no separate right to reimbursement created by the mere fact that Portland Electric Power Company [reserved] an easement. So long as the power company is still allowed to locate its line somewhere within the public right-of-way, no property rights are taken from the power company when it is requested to relocate somewhere within that right-of-way."

The deed language shows that the grantor intended to keep an interest in, and separate from, the land given for a public use. Multnomah County accepted the dedication with the easement. *See Sunset Lake v. Remington,* 45 Or App 973, 976, 609 P2d 896 (1980). The rights of PGE and PP&L originated, not from their facilities being located within the public right of way, but from an express reservation in a deed made by a fee owner.

Although the deed here does not specify a particular location of the easement, the relocation of the 1913 line did not effect an abandonment of the easement that allows the servient owner, the county, to order relocation without compensation. For at least 49 years on the north side of Burnside and 35 years on the south, the county has known about and acquiesced in the location of the lines. That acquiescence has

given the easement a definite location. *See Beck v. Lane County,* 141 Or 580, 589, 18 P2d 594 (1933). The location cannot be changed without consent of both the landowner and easement owner:

> "After the point or place at which, or lying along which an easement is to be exercised has once been fixed, whether by express terms of the grant, or by agreement or acquiescence, one of the parties cannot change such location without the consent of the other." *Jones et ux v. Edwards, et ux,* 219 Or 429, 437, 347 P2d 846 (1959).

Because PGE is not located in the public right-of-way at the sufferance of the government but by express reservation of its predecessor when the grantor deeded the property to the county, the county cannot interfere with the property right without compensation. The situation is that addressed in dictum in *Highway Com. v. Clackamas W. Dist.,* 247 Or 216, 222, 428 P2d 395 (1967):

> "When a franchise is granted to install a pipeline or other facilities in land held by a governmental unit it is reasonable to imply a limitation on the grant requiring the grantee to bear the cost of relocation in the event that the construction of a highway or other public work is deemed desirable. *However, no such implication arises from the creation of an easement to install facilities granted by an owner of private property.*" (Emphasis supplied.)

The county must reimburse PP&L and PGE for relocation between 97th and 122nd Avenue of East Burnside. However, where Gen Tel and PGE maintain shared facilities, only PGE is entitled to reimbursement. *See Firebaugh v. Boring,* 288 Or 607, 607 P2d 155 (1980).

We reverse that portion of the judgment finding that PGE has no rights under the 1928 deed and remand to the trial court for a determination of the compensation to be paid by the county to PGE and PP&L for relocation on East Burnside and Burnside Court.

Who must pay for relocations in the remaining segments of the project is determined by common law. The parties do not quarrel with the common law rule enunciated at the turn of the century. Utilities locating facilities in a public right-of-way must bear the costs of relocation when required to do so by a government exercising its legitimate authority.

*New Orleans Gas Co. v. Drainage Commission of N. O., supra.* The disagreement is whether Utilities fall within the exception to this common law rule embodied in *City of Los Angeles v. Los Angeles Gas and Electric Corp.,* 251 US 32, 40 S Ct 76, 64 L Ed 121 (1919). In that case, the city required a *private electric utility* to move its fixtures in order to make way for the installation of a *city-owned electrical system.* The Supreme Court carved an exception to the general common law rule. The city was operating in a "proprietary" as opposed to "governmental" capacity and therefore had to compensate the · utility.

Utilities here argue that the *City of Los Angeles* exception applies, because defendants are acting in a proprietary capacity because they are required to relocate their private facilities to make room for a publicly owned utility, the LRT. They claim that unless they are compensated there will be a taking of property without compensation in violation of the Fourteenth Amendment to the United States Constitution and Article I, section 18, and Article XI, section 4, of the Oregon Constitution.[6]

We do not find the governmental/proprietary distinction urged so strenuously by Utilities to be a particularly helpful analytic tool in utility relocation law.[7] The *City of Los Angeles* case is unique in United States Supreme Court relocation cases. The Los Angeles public electrical system was supplanting and directly competing with a private electric utility. The analysis in *City of Los Angeles* and other Supreme Court utility relocation cases, as we understand them, does not turn on semantics, but whether the facts show that the governmental activity responds to a legitimate public need. The governmental/proprietary rubric is one shorthand way of

---

[6] The Oregon constitutional provisions state, in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered * * *." Art I, § 18.

"No person's property shall be taken by any corporation under authority of law, without compensation being first made, or secured in such manner as may be prescribed by law." Art XI, § 4.

Utilities make no claim that their rights under the Oregon Constitution differ from the Federal. *See State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983).

[7] The trial court found the distinction to be "an anachronism."

saying that the governmental activity is or is not responsive to such a need.

■　　　What constitutes a public need is a legislative determination. In *New Orleans Public Service v. City of New Orleans,* 281 US 682, 50 S Ct 449, 74 L Ed 1115 (1930), the city had required a private streetcar system to tear down a viaduct and build new tracks even though no construction or street repair was being done which would have necessitated the relocation. The company argued that the new crossing at street level was neither necessary nor safe. The Supreme Court disagreed, stating that the city had shown that the viaduct was deteriorating and that projected increased demand justified additional tracks:

> "Undoubtedly the city, acting as the arm of the state, has a wide discretion in determining what precautions in the public interest are necessary or appropriate under the circumstances." *New Orleans Public Service v. City of New Orleans, supra,* 281 US at 686.

　　　Furthermore that "public need" is not a static concept is reflected in the most recent Supreme Court case, *Norfolk Redev. and Housing Auth. v. C. and P. Tele.,* ___ US ___, 104 S Ct 304, 78 L Ed 2d 29 (1983). The utility did not even challenge that an urban renewal project to be developed under a political subdivision of the State of Virginia served a legitimate public need that required the utility to relocate at its own expense. The utility sought, instead, to avoid the common law result by bringing itself within the meaning of "displaced person" so as to qualify for reimbursement under the Federal Relocation Act. The Supreme Court found no legislative intent to change the basic common law rule of utility relocation law and reaffirmed the *New Orleans* rule in very broad language:

> "Under the traditional common law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Norfolk Redev. and Housing Auth. v. C. and P. Tele., supra,* ___ US at ___, (78 L Ed 2d at 34).

■　　　Utility relocation law in Oregon shows parallel development. Although the Oregon Supreme Court cited with approval the basic rule of *New Orleans* and the *City of Los*

*Angeles* exception to that rule in *Multnomah County v. Rockwood W. Dist.*, 219 Or 356, 347 P2d 111 (1959), Oregon cases do not follow a governmental/proprietary distinction in deciding who must pay. The focus is on public need, *see Multnomah County v. Rockwood W. Dist., supra,* 219 Or at 362, and broad latitude is given to the legislative determination of that need. *See Highway Com. v. Clackamas W. Dist., supra,* 247 Or at 222; *Urban Renewal v. Pacific N. W. Bell,* 23 Or App 384, 542 P2d 908 (1975).

■ Utilities have not shown that the legislative determination of the public need for LRT exceeded the legitimate exercise of governmental authority. They stipulated that the LRT project serves an important public purpose but argue that when a municipality operates a public transit it "competes on a basis similar to any other public utility."[8] Admittedly, LRT will be providing a service to the public, and so do Utilities. Service alone does not make the LRT "just another public utility," so as to bring it within the *City of Los Angeles* exception.

The legislature has determined that there is a need for mass transit and has created a statutory way to meet that need. Tri-Met is a municipal corporation formed pursuant to ORS chapter 267, which authorizes the creation of mass transit districts. After years of study involving input from governmental entities and citizens, it was determined that the best solution to current and projected transportation needs of the Banfield Corridor includes construction of LRT. The study addressed safety, environmental, economic and land use concerns. LRT is funded primarily by federal and state

---

[8] Utilities rely primarily on a series of New York cases to support their conclusion that LRT is "proprietary." In the most recent New York case, *New York Telephone Co. v. City of Binghamton,* 18 NY2d 152, 219 NE2d 184 (1966), the court did not "uphold" or "reject" previous utility relocation cases but limited them strictly to their facts, none of which involves a mass transit system developed as LRT is here. The court found that

"[t]he distinction between 'governmental function' and 'proprietary function' is a sort of abstraction difficult to make meaningful in a day when municipalities continually find new ways to exercise police power in their efforts to cope with the pressing needs of their citizens." 219 NE2d at 186.

The New York court's analysis of the facts showing a need for urban renewal lends credence to defendants' position in this case that the continued viability of the governmental/proprietary distinction in New York utility relocation law is questionable.

subsidies. The system will operate at a loss. There is no claim that any private enterprise competes or wants to compete to provide mass transit along the corridor. The distinction between Utilities and LRT was stated in *Rockwood:*

> "[T]he business [of the utility] is transacted *primarily for the public benefit.* In that regard it differs materially from a private corporation." 219 Or at 362. (Emphasis supplied.)

The public need involved here has been established beyond question. We conclude that Utilities must relocate at their own expense.

Reversed and remanded for determination of compensation to be paid by Multnomah County to PGE and PP&L for relocation of facilities on East Burnside and Burnside Court; otherwise affirmed.