Argued and submitted May 8, affirmed November 26, 1985

NORTHWEST NATURAL GAS CO. et al,
*Petitioners on review,*

*v.*

CITY OF PORTLAND et al,
*Respondents on review,*
PORTLAND GENERAL ELECTRIC COMPANY,
*Petitioner on review.*
(CC A8302-00967; CA A28765; SC S31336)

711 P2d 119

292

Jacob Tanzer, Portland, argued the cause for petitioners on review. With him on the petition were Ball, Janik & Novack, and Warren Hastings, Jr., Portland.

Jeffrey L. Rogers, City Attorney, Portland, argued the cause for respondent on review City of Portland. With him on the response to the petition were Ruth Spetter, Lynda Nelson Gardner and Kathryn Beaumont Imperati, Deputy City Attorneys, Portland.

Paul R. Meyer, of Kobin & Meyer, P.C., Portland, argued the cause for respondents on review County of Multnomah and Tri-County Metropolitan Transportation District. On the response to the petition were John Leahy, Portland, for County of Multnomah, and Susan G. Whitney, of Kobin & Meyer, P.C., Portland, for Tri-County Metropolitan Transportation District.

JONES, J.

## JONES, J.

This is a proceeding for declaratory relief arising from a dispute between five public utilities (plaintiffs) and the City of Portland, Multnomah County and the Tri-County Metropolitan Transit District (Tri-Met) (defendants).[1] The issue is whether the City of Portland has legal authority to compel the utilities to relocate or adjust their existing utility facilities within the public rights-of-way without compensation to accommodate the construction of a light rail transit (LRT) system.

Four investor-owned public utilities, Northwest Natural Gas (NNG), Pacific Power and Light (PP&L), Pacific Northwest Bell (PNB) and General Telephone (Gen Tel) (the "plaintiff utilities"), sought a declaration that defendants City of Portland and Multnomah County could not require uncompensated obedience to the defendants' orders to the utilities to relocate their facilities to accommodate Tri-Met's construction of the LRT system. Defendants counterclaimed, adding Portland General Electric (PGE) as a party seeking a declaration that defendants may require the plaintiff utilities and PGE (collectively, the "utilities") to relocate their facilities without compensation.

The trial court issued a judgment declaring, in essence, that defendants City of Portland and Multnomah County may require the utilities to relocate their facilities within the public rights-of-way without reimbursement for the purpose of accommodating the LRT system and related public improvements.

The Court of Appeals reversed and remanded that part of the trial court judgment which required uncompensated relocation of facilities within the Multnomah County segment of the LRT system.[2] The judgment was affirmed in all other respects. *Northwest Natural Gas Co. v. City of Portland,* 70 Or App 647, 657, 690 P2d 1099 (1984). Review is limited to the issue of whether the utilities are entitled to

---

[1] The State of Oregon Highway Division was also a defendant. No appeal was taken in regard to the state.

[2] The holding pertaining to the Multnomah County segment was based on the Court of Appeals' interpretation of a 1928 deed from PGE's predecessor to Multnomah County. We denied review of any issues arising from this holding.

compensation for relocation of their facilities that lie within the public rights-of-way in the City of Portland.[3] We hold that the utilities are not entitled to compensation for relocation costs.

## HISTORY

Tri-Met is a municipal corporation of the State of Oregon formed pursuant to ORS chapter 267. Tri-Met provides and operates a mass transit system in the Tri-County Portland metropolitan area. It succeeds the privately owned bus and streetcar company, Rose City Transit Company. In cooperation with the City of Portland, Multnomah County and the Highway Division of the Oregon Department of Transportation, Tri-Met is constructing the LRT system to provide public transit between downtown Gresham and downtown Portland.

The light rail transit project culminates a lengthy planning process involving area-wide governmental consultation and public participation. The effort to develop a mass transit solution for the Banfield Corridor was launched after the proposed Mt. Hood freeway was abandoned. The Banfield Light Rail Transit Project was selected from among the top five of 30 alternative proposals. Environmental concerns, including the potential effect on pollution, and economics were considered during the study leading to the choice of the Banfield LRT plan. The trial court took "judicial notice" that the LRT system serves a public purpose. The plaintiff utilities stipulated that the LRT system serves an "important public purpose."

The LRT project is in four segments: (1) Gresham; (2) Multnomah County (East Burnside); (3) I-84 (Banfield) and I-205; and (4) the City of Portland. The Portland segment, the segment that concerns us in this case, runs from I-84 along Holladay Street and across the Steel Bridge to downtown Portland. There it follows First Avenue to Morrison to Eleventh Avenue, where it circles over to Yamhill Avenue and returns to First Avenue. The major utility involvement is in the downtown area.

---

[3] All of the utilities named at the outset of this opinion, except Gen Tel, have facilities located within the Portland public rights-of-way.

Each of the utilities doing business within the city receives authority to operate and maintain facilities in the public rights-of-way from a different source.

NNG operates as successor to an 1859 territorial grant from the territory of Oregon authorizing Henry B. Green to lay gas pipes and apparatus throughout the city. The grant is indefinite as to duration. The franchise is silent on the matter of relocation or relocation costs.

PNB operates in Portland under a revocable permit granted to its predecessor, Pacific Telephone and Telegraph Company, in 1932. Unlike the franchise under which NNG operates, the revocable permit is not silent on the matter of relocation. Section 7 of the permit states in pertinent part:

"Nothing in this revocable permit shall be construed to prevent the City from constructing sewers, grading, paving, planking, repairing and/or altering of any street, alley or avenue, or the laying down or repairing of water mains, or the construction of any other public work by the City. * * * If any of the wires, cables, appliances or conductors or conduits of the grantee herein shall be placed in any of the streets, alleys, avenues and/or public places or grounds of the City so as to directly interfere with *the construction of any public improvement, whether it be the* construction of a sewer, *improvement of a street* or the laying of a water main, all such poles, wires, cables, appliances and conduits shall be removed or replaced in such manner and as shall be directed by the City so the same shall not interfere with said public work of the City, and *such removal shall be at the expense of the grantee herein."* (Emphasis added.)

PP&L operates under a 1966 ordinance granting PP&L a 20-year franchise to use city rights-of-way for conducting electricity and maintaining facilities. Section 3 of the franchise provides:

"The City shall have the right to require the grantee to change the location of any pole, conduit, structure or facility within the street area when the *public convenience* requires such change *and the expense thereof shall be paid by the grantee."* (Emphasis added.)

Section 5 provides:

"Nothing in this franchise shall be construed to prevent the City from constructing sewers, grading, paving, repairing and/or altering any street, alley or public highway, or laying

down, repairing or removing water mains or constructing or establishing any other *public work.* * * * All such poles, wires, conduits, manholes, or other appliances and facilities shall be removed or replaced in such manner as shall be directed by the City so that the same shall not interfere with the said public work of the City and *such removal or replacement shall be at the expense of the grantee herein.*" (Emphasis added.)

PGE and the city stipulated, for the purposes of this case, that any franchise agreement under which PGE operates in the city "expressly reserves to the City of Portland the full police power over such public streets."

## THE RELEVANT PLEADINGS

Counts I and III of the utilities' complaint are the only ones pertinent to our review. Count I of the complaint for declaratory judgment alleges that the defendants (all four defendants are named in the complaint) "are without authority to compel uncompensated relocation by public utilities of their facilities for the proprietary purpose of accommodating a transit system."

Count III alleges that a requirement of uncompensated relocation constitutes a taking of private property in violation of the utilities' rights under Article I, section 18, and Article XI, section 4, of the Oregon Constitution,[4] and the Fourteenth Amendment to the United States Constitution.

COUNT I - *Alleging that Tri-Met must compensate the utilities for relocation costs because it will operate its LRT system as a proprietary function.*

Count I of the plaintiff utilities' complaint alleges that the defendants are without authority to compel uncompensated relocation because Tri-Met was acting for the proprietary purpose of constructing a transit system. To support Count I, the utilities rely heavily on *Multnomah County v. Rockwood W. Dist.,* 219 Or 356, 361, 347 P2d 111 (1959), in which this court stated:

---

[4] Article I, section 18, of the Oregon Constitution, provides:

"Private property shall not be taken for public use * * * without just compensation * * *."

Article XI, section 4, provides:

"No person's property shall be taken by any corporation under authority of law, without compensation being first made * * *."

"It is an almost universal common-law rule that private utility companies are required to move at their own expense their water, electric and other lines, subject to the police power of the state, and whenever the health and public safety require this to be done, unless they are covered by special ordinance or law. *Transit Commission v. Long Island Railroad Co.,* 253 NY 345, 171 NE 565 [1930]; *New Orleans Gaslight Co. v. Drainage Commission of New Orleans,* 197 US 453, 25 S Ct 471, 49 L ed 831 [1905].

"The above rule does not, however, extend so far as to put the cost of relocation upon a private utility company when the change is for the benefit of other private utility companies or for the benefit of a municipality exercising a proprietary rather than a governmental function. *City of Los Angeles v. Los Angeles Gas & Electric Corp.,* 251 US 32, 40 S Ct 76, 64 L ed 121 [1919]; *New York & Queens Electric Light & Power Co. v. City of New York,* 221 App Div 544, 224 NYS 564 [1927]."

The utilities argue that the city's attempt to require uncompensated relocation falls into the limitation on the general rule stated in *Multnomah County v. Rockwood W. Dist., supra,* because the construction of the LRT system by Tri-Met, which the utilities characterize as a public utility, is the exercise of a proprietary function rather than a governmental function.

## 1. The governmental/proprietary distinction

The governmental/proprietary distinction has led a less than tranquil life. As this court commented in *City of Pendleton v. Holman,* 177 Or 532, 541, 164 P2d 434 (1945), in applying a statute of limitations in a municipal lien foreclosure case, "[t]he distinction between governmental and proprietary functions of a city has probably been the subject of as much controversy as any other question before the courts. Even in the maintenance of streets there is a diversity of opinion as to whether the city is acting in a governmental or proprietary function." Courts and commentators have often subjected the distinction to caustic and scathing criticism,[5] yet

---

[5] The United States Supreme Court in *Indian Towing Co. v. United States,* 350 US 61, 65, 76 S Ct 122, 100 L Ed 48 (1955), referred to the distinction as a "quagmire that has long plagued the law of municipal corporations. * * * [A]n irreconcilable conflict. * * * [A] rule of law that is inherently unsound. * * * [A]n endeavor * * * to escape from the basic historical doctrine of sovereign immunity." *See also Employees v. Missouri Public Health Dept.,* 411 US 279, 297 n 11, 93 S Ct 1614, 36 L Ed 2d 251

it has withstood assaults because occasionally courts have found the distinction useful in some cases, *see* Wells and Hellerstein, *The Governmental-Proprietary Distinction in Constitutional Law,* 66 Va L Rev 1073 (1980).

Professors Wells and Hellerstein assert that the governmental/proprietary distinction lacks any fixed content. It is neither a single nor a simple rule. 66 Va L Rev at 1075. The content of the distinction is dependent upon the purpose for which the distinction is sought. Such purpose will by necessity differ from one situation to the next. These academicians contend that the terms "governmental" and "proprietary" should be viewed as labels expressing the conclusion that a particular activity carried on by a governmental body should be accorded a particular legal status. If viewed in this way, they assert the terms "governmental" and "proprietary" serve a very useful purpose in the law. The terms provide the means by which in a single word or phrase the connection between a set of factual circumstances and a set of legal conclusions which can be drawn from those facts may be expressed. 66 Va L Rev at 1136.

But these same writers hasten to point out that the

---

(1973) (Marshall, J., concurring) ("unenlightening characterizations of States' activities"); *Elgin v. District of Columbia,* 337 F2d 152, 156 (DC Cir 1964) ("the talismanic formula").

Many commentators also have criticized the distinction. Antieau, *The Tort Liability of Municipalities,* 40 Ky L J 131, 133 (1952) (the distinction is "unserviceable"); Barnett, *The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations,* 16 Or L Rev 250, 250 (1937) ("the distinction originated chiefly in a combination of misguided logic and misapplied precedent"); Borchard, *Government Liability in Tort* (pts 1-3), 34 Yale L J 1, 129, 229 (1924-25), (pts 4-5) 36 Yale L J 757, 1039 (1926-27); Davis, *Tort Liability of Governmental Units,* 40 Minn L Rev 751, 773-79 (1956) (advocating elimination of the distinction); Doddridge, *Distinction Between Governmental and Proprietary Functions of Municipal Corporations,* 23 Mich L Rev 325 (1925); Fuller & Casner, *Municipal Tort Liability in Operation,* 54 Harv L Rev 437, 441-43 (1941); Leflar & Kantrowitz, *Tort Liability of the States,* 29 NYU L Rev 1363, 1366 (1954); Seasongood, *Municipal Corporations: Objections to the Governmental or Proprietary Test,* 22 Va U L Rev 910, 938 (1936) ("The rules sought to be established are as logical as those governing irregular French verbs"); Smith, *Municipal Tort Liability,* 48 Mich L Rev 41, 43-48 (1949); Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus,* 10 UCLA L Rev 463, 502 (1963) (criticizing "chaotic inconsistencies which presently exist in the law governing utility relocations"); Comment, *Cost Allocation in Public Utility Relocation in California,* 23 Hast L J 848 (1972) (advocating statutory remedies to resolve confusion in cases using distinction); *see also* Comment, *An Analysis of the Theories Advanced for the Continuation of Municipal Tort Liability,* 2 Cum-Sam L Rev 437, 441 (1971); Note, *Municipal Corporations—The Governmental-Proprietary Distinction,* 41 Miss L J 471, 477-81 (1970); Annot, 75 ALR 1196 (1931).

courts have devoted little attention to articulating the criteria used to distinguish governmental from proprietary activities. 66 Va L Rev at 1077. Courts often assert, without analysis, that a particular activity is governmental or proprietary. *See* Van Alstyne, *A Governmental Tort Liability: A Public Policy Prospectus,* 10 UCLA L Rev 463, 466 (1963); Antieau, *The Tort Liability Municipalities,* 40 Ky L J 131, 147 (1952); Seasongood, *Municipal Corporations: Objections to the Governmental or Proprietary Test,* 22 Va U L Rev 910 (1936). Professor Kenneth Culp Davis points out that the failure to analyze the distinction has led to absurdities such as decisions that a state "has both governmental electricity and proprietary electricity, and another state has both governmental manholes and proprietary manholes." Davis, *Tort Liability of Governmental Units,* 40 Minn L Rev 751, 778 (1956) (citations omitted).

Utility relocation cases categorize municipal activities as governnmental or proprietary without helpful analysis. The results are mixed, perhaps chaotic. *See* Van Alstyne, *supra,* 10 UCLA L Rev at 502. Highway safety, swamp drainage and other similar activities directed toward public health and safety have been held to be governmental. *See N.O. Public Service v. New Orleans,* 281 US 682, 50 S Ct 449, 74 L Ed 1115 (1930) (highway safety); *New Orleans Gas Co. v. Drainage Comm.,* 197 US 453, 25 S Ct 471, 49 L Ed 831 (1905) (swamp drainage). Some courts have held that municipally operated mass transit, water, lighting, and power utilities were proprietary. *See City of New York v. New York Telephone Co.,* 278 NY 9, 14 NE2d 831 (1938) (subway entrance to municipally owned mass transit system); *Metropolitan Utilities District v. City of Omaha,* 112 Neb 93, 96, 198 NW 858 (1924) (municipally owned gas and water utility); *Postal Tel.-Cable Co. v. San Francisco,* 53 Cal App 188, 190, 199 P 1108 (1921) (municipally owned railway system); *Los Angeles v. Los Angeles Gas & Electric Corp.,* 251 US 32, 40 S Ct 76, 64 L Ed 121 (1919) (municipally owned street lighting system). However, other courts have held similar activities to be governmental. *Southern Cal Gas Co. v. City of Los Angeles,* 50 Cal 2d 713, 329 P2d 289 (1958) (sewers); *People's Gas Light & Coke Co. v. City of Chicago,* 413 Ill 457, 109 NE2d 777 (1952) (municipally owned subway).[6]

---

[6] Some other court decisions have avoided using the distinction in utility

Most courts have not analyzed the basis for the distinctions between governmental and proprietary activities. As one commentator has stated, the distinction lends itself to "mechanical adjudication." Antieau, *supra,* 40 Ky L J at 147. The *Rockwood* case, which the utilities so heavily relied upon for the distinction, is also totally without analysis. It is true that in that four-judge panel decision the following words appear:

"The above rule does not, however, extend so far as to put the cost of relocation upon a private utility company when the change is for the benefit of other private utility companies or for the benefit of a municipality exercising a proprietary rather than a governmental function. * * *" 219 Or at 361.

However, the statement is pure *dictum,* unnecessary and inapplicable to the decision. The *Rockwood* court held that the Rockwood Water District was a municipal corporation acting for the public health and safety, and that the district had prior rights to use the street where the underground pipes were located. 219 Or at 365. The court did not use the governmental/proprietary distinction to determine whether a governmental agency must pay a privately owned public utility for the cost of relocating facilities located on government property.

Courts that do attempt to offer analysis in their decisions seem to assert that governmental and proprietary functions are distinguishable based on whether the public bodies are engaged in activity that is (1) essential or necessary for the government to perform, or (2) traditional for the government to perform.

In their exhaustive review of cases where the courts have attempted analysis for the governmental/proprietary

---

relocation cases, requiring uncompensated relocation based on the public's paramount right to use of the streets. *Pacific Tel. & Tel. Co. v. Redevelopment Agency,* 75 Cal App 3d 957, 142 Cal Rptr 584, 591 (1977) ("A utility's right to compensation [should not depend] on whether municipal activity is 'governmental' or 'proprietary' "); *Port of New York Authority v. Hackensack Water Co.,* 41 NJ 90, 195 A2d 1, 8 (1963) ("The distinction between 'governmental' and 'proprietary' is always unsatisfactory"); *New York Telephone Co. v. City of Binghamton,* 18 NY2d 152, 159, 272 NYS2d 359, 219 NE2d 184 (1966) ("The distinction between 'governmental function' and 'proprietary function' is a sort of abstraction difficult to make meaningful in a day when municipalities continually find new ways to exercise police power in their efforts to cope with the pressing needs of their citizens.").

distinction, Professors Wells and Hellerstein found no cases stating that an activity undertaken by a public body was not an essential governmental function. 66 Va L Rev at 1103. Thus, the "essential or necessary" analysis is virtually useless because under this test most, and perhaps every, contested activity will be labeled governmental rather than proprietary.[7]

In the same way, the cases that use the traditional function test for the governmental/proprietary distinction are not helpful either. The cases supporting the view that operation of mass transit systems is not a traditional governmental function date back to the turn of the century up through the Depression era, when most mass transit systems were privately operated. However, as demonstrated by the record in this case, by 1964 many mass transit systems in this country were publicly operated and most privately owned mass transit companies were either bankrupt or required substantial federal aid to survive. This economic situation prompted the passage of the Urban Mass Transportation Act of 1964 (UMTA), Pub L 88-365, 78 Stat 302, as amended, 49 USC App §§ 1601 *et seq.* [49 USC Appx § § 1601 *et seq.*], which provided substantial federal assistance to urban mass transit programs. Obviously, changes in economics and the demands on government change which activities are traditionally and customarily engaged in by government.[8] Thus, the so-called "traditional function" test becomes a sliding rule with no legal stability.

■ In the recent Supreme Court of the United States case of *Garcia v. San Antonio Metro.,* 469 US 528, ___, 105 S

---

[7] Justice Black observed in *Helvering v. Gerhardt,* 304 US 405, 427, 58 S Ct 969, 82 L Ed 1427 (1937) (concurring opinion):

"There is not, and there cannot be, any unchanging line of demarcation between essential and non-essential governmental functions. Many governmental functions of today have at some time in the past been non-governmental. The genius of our government provides that, within the sphere of constitutional action, the people—acting not through the courts but through their elected legislative representatives—have the power to determine as conditions demand, what services and functions the public welfare requires."

[8] *See* Seasongood, *supra* n 2, 22 Va U L Rev at 915:

"With the limited city activities prevalent when the rule was promulgated, a distinction between the two categories could be drawn with some sharpness and precision. But now as various functions fuse the classes overlap, and the commingling will increase as urban civilization becomes more complex and inclusive. * * *"

Ct 1005, 1007, 83 L Ed 2d 1016, 1020 (1985), Justice Black-mun, who delivered the opinion of the court, noted that the federal district court had concluded that municipal ownership and operation of a mass transit system was a traditional governmental function. On the other hand, Justice Blackmun observed that three federal courts of appeal and one state appellate court had reached the opposite conclusion. The issue in *Garcia* was whether the Commerce Clause empowered Congress to enforce the minimum-wage and overtime provisions of the Fair Labor Standards Act against the states "in areas of traditional governmental functions." Justice Blackmun concluded that the governmental/proprietary distinction, discarded by that court as unworkable in the field of tax immunity,[9] had proved no more fruitful in the field of regulatory immunity under the Commerce Clause. We conclude that the governmental/proprietary distinction is equally unworkable, untenable and unhelpful in deciding mass transit/utility relocation cases.

Rather than using an unworkable distinction to resolve Count I of plaintiffs' complaint, we analyze this problem under state statutes, applicable municipal charters and ordinances, and the specific agreements entered into by the parties.

The utilities contend that without the governmental/proprietary distinction, municipalities will be left with free rein to displace utilities under the guise of "public necessity." This is a mistaken view, because municipalities must act constitutionally, within applicable statutes, and within the authority of their charters and ordinances. Municipalities must also honor contractual obligations of their franchises.

The City of Portland's authority to order an uncompensated relocation is not to be determined by applying general rules of the common law. Past judicial opinions may be helpful, but only where the factual settings are similar. We previously have made a similar statement regarding local control over municipal debt limitations. *DeFazio v. WPPSS,*

---

[9] Almost 40 years ago the Supreme Court of the United States unanimously concluded that the distinction between "governmental" and "proprietary" functions was "untenable" and must be abandoned in the tax immunity case of *New York v. United States,* 326 US 572, 583, 66 S Ct 310, 90 L Ed 326 (1946).

296 Or 550, 679 P2d 1316 (1984). In *DeFazio* we stated that a charter is a matter of local legislation to be

> "* * * interpreted by the same means as other legislation, including attention to the meaning intended by those who adopted it if that can be ascertained. It is not a matter of common law, to be resolved by consulting caselaw or encyclopedic summaries of caselaw. *Cf. Anderson v. Peden,* 284 Or 313, 315-16, 587 P2d 59 (1978) (concerning the meaning of 'conditional use' in zoning ordinances). A city can write its charter or ordinance to define for itself the amount, character, or purposes of indebtedness that it means to limit. Not only can cities choose different words; legislative history may show that cities, like state legislatures, meant different things by the same words.

> "* * * * *

> "Again, charter authority 'is not a matter of common law, to be resolved by consulting case law or encyclopedic summaries of case law.' [Citing the above.] Adoption of a charter is a political act of a particular community at a particular time. A court's decision that one city did not have authority to undertake a project does not decide whether another city has such authority, or the same city at another time. A city can write or amend its charter or ordinance to define for itself what functions and services it wants its agencies to perform, consistent with statutes and the constitution. * * *" 296 Or at 569-70, 580.

The resolution of Count I depends on two things: (1) the sources governing the authority of the City of Portland to require the utilities to relocate in aid of Tri-Met, and (2) the specific franchises of the utilities.

2. Portland's authority to order uncompensated relocation

Portland's city charter,[10] adopted in 1903, specified

---

[10] Historically, city charters allowed cities to legislate so that they could adapt to the realities of urban society. Teaford, *Special Legislation and the Cities 1865-1900,* 23 Am J Legal History 189, 190 (1979). Local assemblies drafted the charters which were then introduced into the legislative assembly. The charter was then " 'referred to a committee consisting of the members from [the drafting] county, reported favorably, of course, and enacted by unanimous consent of the legislature. No other member ever sees or cares anything about it.' " *Rose v. Port of Portland,* 82 Or 541, 561, 162 P 498 (1917), quoting legislative history of a proposed amendment to Article XI, section 2, of the Oregon Constitution.

In 1906 the State of Oregon recognized the local nature of a charter, and adopted Article XI, section 2, of the state constitution. This provision made charter enactment a matter of local, not statewide, concern.

the city's authority regarding street uses. Chapter 1, Article I, Section 3, of that charter provided a general grant of authority:

"The City of Portland shall be invested within its limits with authority to perform all public services and with all governmental powers except such as are expressly conferred by law upon other public corporations and subject to the limitations prescribed by the constitution and laws of the state, except as hereinafter provided."

The Portland charter also provided specific areas open to municipal legislation. Chapter 3, Article IV, Section 73. These areas included the location of water pipes, and the furnishing of water and lighting for the city. Section 73(12) specifically authorized the city to provide for

"* * * the opening, laying out, establishing, altering, extending, vacating and closing or for establishing and changing the grades of streets, squares, parks, public places, and to provide for the *improving and repairing of streets, squares, parks and public places or of any land over which any right of way has been obtained, or granted for any purpose of public travel* by means of any kind of work, improvement or repair mentioned in this Charter, subject to the provisions and limitations contained in this Charter, and in the Constitution of the State of Oregon." (Emphasis added.)

Section 73(60) and (61) authorized the city to regulate and control the streets "for any and every purpose." Lastly, Section 74 of Chapter 3 stated that none of these enumerated powers limited the initial general grant of authority, quoted *ante.*

The charter provisions authorized the City of Portland to exercise governmental powers, to locate certain utility fixtures, and to improve, repair and regulate the streets and other public rights-of-way. Such regulation necessarily would include the ordering of utility relocation to accommodate a public improvement such as a light rail transit system.

As early as 1911, the state legislature empowered the cities to regulate utilities. Oregon Laws 1911, chapter 279, section 61, provided in pertinent part:

"Every municipality shall have power —

(1)   To determine by contract, ordinance or otherwise the quality and character of each kind of product or service to be

furnished or rendered by any public utility furnishing any product of [sic] service within said municipality and all other terms and conditions not inconsistent with this Act upon which such public utility may be permitted to occupy the streets, highways or other public property within such municipality and such municipality shall be in force and *prima facie* reasonable. * * *

(2) To require of any public utility by ordinance or otherwise such modifications, additions and extensions to its physical equipment, facilities or plant or service within said municipality as shall be reasonable and necessary in the interest of the public, and to designate the location and nature of all such additions and extensions, the time within which they must be completed and all conditions under which they must be constructed subject to review by the Commission as provided in this section."

This statute was later redesignated as ORS 221.420, which provides in relevant part:

"(2) Every city may:

(a) Determine by contract or prescribe by ordinance or otherwise, the quality and character of each kind of product or service to be furnished or rendered by any public utility, furnishing any product or service within such city, and all other terms and conditions upon which any public utility may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility therefrom.

(b) Require any public utility, by ordinance or otherwise, to make such modifications, additions and extensions to its physical equipment, facilities or plant or service within such city as shall be reasonable or necessary in the interest of the public, and designate the location and nature of all additions and extensions, the time within which they must be completed, and all conditions under which they must be constructed."

This statute delegates power to the cities. The cities may govern all conditions associated with the utilities' use of the public streets. Pursuant to this statutory authority, the City of Portland, in 1969, enacted Portland City Code Section 17.56.060, which provides:

"Every person owning, operating, or managing any public utility in the City and using poles located in public area for utility purposes, shall relocate any pole at the expense of the

utility whenever required by the City Engineer. When other facilities used for public utility purposes are located in public area such facilities shall be relocated at utility expense whenever required by the City Engineer for a public improvement or for the public safety."

This ordinance authorizes the City of Portland to order uncompensated relocations of poles and other facilities for public improvements. Here the administrator of the Department of Public Works, who supervises the city engineer, ordered the relocations to accommodate the LRT. As we have previously stated, the LRT was planned for the general welfare and public convenience. It is a public improvement within the ordinance.

■     The utilities argue that this ordinance does not apply because it was enacted in 1969, after the utilities had been granted their franchises. There is no question and the parties do not dispute that the utilities could never take away the municipality's authority to act for the public's general welfare; this is a power that cannot be bargained away. *Highway Com. v. Clackamas W. Dist.,* 247 Or 216, 220, 428 P2d 395 (1967); *New Orleans Gas Co. v. Drainage Comm.,* 197 US 453, 25 S Ct 471, 49 L Ed 831 (1905). The regulation of city streets for purposes of transportation is a proper exercise of the city's governmental authority.

■     The 1969 city ordinance, based on these well-entrenched principles of municipal law, merely articulated preexisting rights. The ordinance also codified the general principle that courts applied to utility relocations before the ordinance existed. This general principle was that utilities must bear the expense of utility relocation when such relocation is required to accommodate a public work. *New Orleans Gas Co. v. Drainage Comm., supra,* 197 US at 462; *see also Norfolk R & H Auth. v. Chesapeake and Potomac Tel.,* 464 US 30, 104 S Ct 304, 78 L Ed 2d 29 (1983) (favorably citing the common law principle enunciated in the *New Orleans Gas* case).

The general principle has been adopted by this court. When a franchise allows utilities to use the streets, "it is reasonable to imply a limitation on the grant requiring the grantee to bear the cost of relocation in the event that the construction of a highway or other public work is deemed

desirable." *Highway Com. v. Clackamas W. Dist., supra,* 247 Or at 222.

The Portland City Charter allows the city to act with governmental power of the state; statutes authorize the city to regulate utilities; and the ordinances passed under the charter allow the city to order uncompensated relocation when the relocation is for the public benefit.

We now turn to the specific franchises to determine whether they give the utilities any specific contract rights to recover compensation for relocation independent of any general law, statute or city ordinance.

3.  Franchise agreements

To assist in the interpretation of these specific franchises, we first examine the basis for the control of public streets by the municipality.

Historically, roads were built in newly established settlements when adjoining landowners "dedicated" land for public thoroughfares as a convenient means of transportation and communication. 2 Pond, A Treatise on the Law of Public Utilities 869-70, § 498 (4th ed 1932). In some cases dedication vested fee ownership in the municipality, but in trust for the public use. *See Savage v. Salem,* 23 Or 381, 383, 31 P 832 (1893); Selvin, *The Public Trust Doctrine in American Law and Economic Policy, 1789-1920,* 1980 Wis L Rev 1403, 1403 n 4. Once land was dedicated, the municipality had the right and responsibility to act "in the interest of the public health and the general welfare." 2 Pond at 453, § 395.

However, in Portland, as elsewhere, fee ownership remained in the original landowner. *Sharkey v. City of Portland,* 58 Or 353, 362, 106 P 331, 114 P 933 (1911). The public was granted an easement for the use of the streets, *Huddleston v. City of Eugene,* 34 Or 343, 351, 55 P 868 (1899); *Lankin v. Terwilliger,* 22 Or 97, 99, 29 P 268 (1892), and the municipality retained the power to improve, grade, pave and regulate those streets, 3 Dillon, Commentaries on the Law of Municipal Corporations 1766, § 1120 (5th ed 1911). In some cases the government undertook street construction on those lands and the landowner remained uncompensated. *Sears v. Crocker,* 184 Mass 586, 69 NE 327 (1904) (the public's easement included the land both above and below the surface, as well as the

surface, and the construction of a subway line was a proper street use which did not entitle the private landowner to compensation); *see also Callender v. Marsh,* 18 Mass 418 (1823); *Radcliff's Executors v. Mayor of Brooklyn,* 4 NY 195 (1850).

The state or municipality also granted franchises to corporations to use these public streets and highways for providing public services. 3 Dillon, *supra,* at 1905-07, § 1210. A franchise is a "special privilege granted by the government to a person or corporation, which privilege does not belong to the citizens of a county generally, of common right." *Whitbeck v. Funk,* 140 Or 70, 73-74, 12 P2d 1019 (1932). A franchise allows the grantee to exercise powers which, without the franchise, the grantee could not exercise. *Whitbeck,* 140 Or at 74.

■ In interpreting these franchises, "if the terms of the franchise are doubtful, they are to be construed strictly against the grantee and liberally in favor of the public." *City of Joseph v. Joseph Water Works Co.,* 57 Or 586, 591, 111 P 864, 112 P 1083 (1911). We now turn to the specific franchises governing the rights of the City of Portland and of the utilities.

a.   The Pacific Northwest Bell, Pacific Power & Light, and Portland General Electric franchises

■ Pacific Northwest Bell operates in Portland under a revocable permit granted in 1932. Section 7 of that permit specifies that PNB must pay relocation expenses when the relocation is ordered because PNB's facilities interfere with a public improvement or public work. The LRT system is a public improvement, and the utilities have stipulated that it provides an important public service. Since the LRT system is a public improvement, PNB must pay the relocation costs. The city's relocation order does not violate the PNB franchise.

The Pacific Power & Light franchise also expressly addresses the relocation issue. Section 3 of the franchise specifies that PP&L must pay relocation expenses when the city orders relocation for public convenience or for the establishment of a public work.

Portland General Electric stipulated that its franchise reserved to the City of Portland the full "police power"

over the city streets. This governmental power to act for the public health and convenience is the authority which the city relied on when ordering PGE's uncompensated relocation.

■      The franchises of PNB and PP&L specify that the utilities will pay relocation costs when the city acts on behalf of the public. The PGE franchise puts the same burden on PGE when the city exercises its "police power." Here the city has acted for public convenience and in the public's general welfare. Therefore, the city has acted within its legitimate governmental authority in ordering the uncompensated relocation by PNB, PP&L and PGE.

b.    The Northwest Natural Gas franchise

Northwest Natural Gas operates as a successor to an 1859 grant from the territory of Oregon to Henry Green authorizing Green to lay gas pipes in the city. Unlike the other utilities, NNG's franchise is silent regarding relocation or relocation expenses. Because of this difference, we examine the circumstances of the original franchise to Green.

In 1851, the legislative assembly of the territory of Oregon formed the City of Portland. This Act created the city boundaries and set out other city functions, but did not mention the city's ability to grant utility franchises. In 1864, the state legislature again addressed Portland's incorporation. In that year, the legislature authorized the city to provide for lighting the city streets with gas or other light sources, and to provide for any construction necessary for that lighting. Special Laws of Oregon 1864, ch V, § 328, p 9.

In 1893, the city enacted Ordinance No. 8101. This ordinance was an agreement with East Portland Gas Light Co., a successor to Henry Green. The ordinance was necessitated by the expansion of gas works to the east side of the city where Green had not operated. The agreement provided for East Portland Gas Light Co. to supply gas to the city. The agreement was silent regarding relocation, as was Green's franchise. It was not until 1903 that the city charter was adopted and a provision added which authorized franchises and dealt with their duration. The charter did not mention relocation or relocation costs. *See* Portland City Charter, Chapter 3, Article V(b) (1903).

At the time of these franchises, there was no state

statute or city ordinance governing the cost of utility reloca-
tion but, by 1823, courts recognized that municipalities were
not liable for damages caused to adjoining landowners by
changing the street grade. *Callender v. Marsh,* 18 Mass 418,
434-35 (1823); *see also Hovey v. Mayo,* 43 Me 322 (1857);
*Radcliff's Executors v. Mayor of Brooklyn, supra;* 2 Dillon, The
Law of Municipal Corporations 646-47, § 543 (2nd ed 1873). A
similar analysis was applied to utilities to deny compensation
when relocation was required because of street improvements.
Courts recognized that "the company took the risk of their
location and should be required to make such changes as
public convenience or security requires, at its own cost and
charge." *In re Deering,* 93 NY 361 (1883) (the expense of
relocating gas pipes because of a change in the street grade
should be placed upon the utility and not upon the individual
landowner). For other illustrative cases, *see also National
Water-Works of New York v. City of Kansas,* 28 F 921 (1886)
(water company has no claim for compensation when moving
pipes to accommodate construction of a sewer); *Louisville City
Railway Co. v. City of Louisville,* 71 Ky 415 (1871) (city need
not compensate railway company for cost of replacing rails to
accommodate street improvements); *Kirby and Loane v. The
Citizens Railway Co.,* 48 Md 168 (1877) (city is under no
obligation to pay expenses for moving railway tracks to
construct a sewer under the street); *Jamaica Pond Aqueduct
Corp. v. Inhabitants of Brookline,* 121 Mass 5 (1876) (right to
maintain water pipes under highway gives no claim for com-
pensation for damages sustained by the raising of street
grade); *Jersey City v. City of Hudson,* 13 NJ Eq 420 (1861)
(water company must lower pipes at its own expense to
conform to new street grade); *Columbus Gas Light & Coke Co.
v. Columbus,* 50 Ohio St 65, 33 NE 292 (1893) (gas company
may not maintain an action for damages when its pipes must
be moved to accommodate new street grade).

■   The City of Portland contends that it has authority
to require relocation under Section I of the 1859 franchise.
That provision allows the city "on account of the growth of
the city" to require relocation at grantee's expense of its
"manufactory of gas, with all the necessary buildings, appa-
ratus, machinery, and fixtures." NNG's manufactory was
dismantled in 1956. NNG now buys and resells natural gas. It
no longer manufactures it. However, the franchise expressly

provides that no compensation be paid to the utility for relocation of gas apparatus. We infer from this provision that no compensation is required for relocation of other types of gas facilities not in existence in 1859, but which replace outdated facilities while achieving the same or similar purpose, that is, furnishing gas power to the public.

This interpretation squares with the general principle cited above that the utility must pay relocation costs if the city's relocation order is within the city's legitimate governmental authority. *Highway Com. v. Clackamas W. Dist., supra; New Orleans Gas Co. v. Drainange Comm., supra.* Here the City of Portland ordered the relocation to construct the LRT system. The LRT system serves a public function and, therefore, the city's order of uncompensated relocation to accommodate a public improvement is within its legitimate governmental authority.

We conclude that the utility companies may not recover the costs of the relocation of their facilities for the Portland segment of the light rail transit system from Tri-Met or the City of Portland.

COUNT III - *Alleging that requiring relocation constitutes a "taking" which must be compensated under Eminent Domain law.*

Count III of the complaint alleges that a requirement of uncompensated relocation constitutes a taking of private property in violation of the utilities' rights under Article I, section 18, and Article XI, section 4, of the Oregon Constitution, and the Fourteenth Amendment to the United States Constitution.

The utilities argue that the right granted to them, by franchise and permit, to locate facilities within the public rights-of-way, is a property right that cannot be taken without just compensation. To demonstrate that the franchise is "property," they cite the Portland City Charter, Chapter 10, Article II, Section 10-202, which provides:

> "Every franchise granted under this charter shall be taken and deemed as property and shall be subject to taxation as property."

The answer to the contention that the relocation of

the utilities constitutes a taking of private property is simple. No private property is being taken by the defendants. The only "property" the utilities acquired by franchise and permit is the right to locate their facilities somewhere in the public rights-of-way, and to use the rights-of-way to the extent necessary to furnish their respective services to the public. *See Pacific Tel. & Tel. v. Redevelopment Agency,* 75 Cal App 3d 957, 963, 142 Cal Rptr 584, 588 (1977). Nothing in the franchises or permit involved in this case gives the utilities the right to any particular location. *Cf. New Orleans Gas Co. v. Drainage Comm.,* 197 US 453, 459, 25 S Ct 471, 49 L Ed 831 (1905). The conclusion that the utilities have no property interest in a particular location in the public rights-of-way is consistent with *Highway Com. v. Clackamas W. Dist., supra,* 247 Or at 222, in which this court held:

"The trial court correctly concluded that the franchise granted to defendant 'is not a vested property right but merely a permissive use subject to * * * change whenever the use of the right of way for the benefit of the public requires it.' "

The city charter provision does not convert the right to use the public rights-of-way into an ownership interest in the street itself. *See County of L.A. v. Southern Cal. Tel. Co.,* 32 Cal 2d 378, 387, 196 P2d 773 (1948), *appeal dismissed* 336 US 929 (1949).

This court has recognized that in the absence of contrary language, "there is an implied obligation on the part of the grantee to relocate its facilities at its own expense when a governmental use of the streets makes the relocation necessary." *Highway Com. v. Clackamas W. Dist., supra,* 247 Or at 221 (footnote omitted). What the law implies is explicitly stated in PNB's revocable permit at Section 7, and PP&L's franchise at Sections 3 and 5, quoted *ante.* The franchise granted to NNG and, for purposes of this case, PGE's franchise, are silent regarding relocation and thus are subject to the implied obligation stated above.

In *Highway Com. v. Clackamas W. Dist., supra,* 247 Or at 222, we said that "[w]hen a franchise is granted to install a pipeline or other facilities in land held by a governmental unit it is reasonable to imply a limitation on the grant requiring the grantee to bear the cost of relocation in the event that the construction of a highway or other public work is deemed desirable." The construction of the LRT system by

Tri-Met benefits the public such that the utilities must bear the expense of the relocation of their facilities to make way for the project. The utilities stipulated that the LRT system serves an "important public purpose." Even if the utilities had not so stipulated, we would conclude that the construction of the LRT system is a public work being undertaken for the public benefit.

The city's action in ordering the uncompensated relocation did not impose on the utilities a burden other than that assumed when the franchises and permit were granted and accepted. Therefore, the city's insistence that the utilities do what they had either expressly or impliedly already agreed to do as a condition of locating their facilties in the public rights-of-way did not result in a taking or damaging of the utilities' franchise rights. The city's order to relocate the utilities without compensation does not constitute a taking under Article I, section 18, or Article XI, section 4, of the Oregon Constitution, or the Fourteenth Amendment to the United States Constitution.

## MUST COMPENSATION FOR RELOCATION BE PAID WHEN ONE PUBLIC UTILITY IS REQUIRED TO RELOCATE FOR ANOTHER PUBLIC UTILITY?

The only remaining question is whether the city may require uncompensated obedience to its relocation orders where the relocation is necessitated by work undertaken by an entity other than the city itself. The utilities contend that the services they furnish to the public benefit the public no less than a mass transit system. They argue that any implied obligation to relocate their facilities at their own expense cannot be invoked by the city for the benefit of Tri-Met, another utility.

Tri-Met is not just another utility. Tri-Met is "a municipal corporation of this State, and a public body, corporate and politic, exercising public power." ORS 267.200. It is a mass transit district organized pursuant to ORS chapter 267 for the primary purpose of "providing a mass transit system for the people of the district."[11] ORS 267.080. Unlike the

---

[11] ORS 267.010 defines "mass transit system" as

"* * * the property, equipment and improvements of whatever nature owned,

utilities, Tri-Met does not occupy the streets at the sufferance of the city or by franchise or permit. Tri-Met's authority to occupy the public rights-of-way is a necessary attribute of its existence and purpose, and is provided for by statute. ORS 267.200, which describes the existence, status and general powers of mass transit districts, provides in relevant part:

"* * * [A mass transit district] shall have full power to carry out the objects of its formation and to that end may:

* * * * *

(2)     Acquire by condemnation, purchase, lease, devise, gift or voluntary grant real and personal property or any interest therein, located inside the boundaries of the district and take, hold, possess and dispose of real and personal property purchased or leased from, or donated by, the United States, or any state, territory, county, city or other public body, nonprofit corporation or person for the purpose of providing or operating a mass transit system in the district and aiding in the objects of the district.

* * * * *

(4)     Build, construct, purchase, lease, improve, operate and maintain, subject to other applicable provisions of law, all improvements, facilities or equipment necessary or desirable for the mass transit system of the district.

* * * * *

(11)     Do such other acts or things as may be necessary or convenient for the proper exercise of the powers granted to a district by ORS 267.010 to 267.390."

Subsections (2) and (4) constitute a grant of authority to Tri-Met to occupy the public rights-of-way. In addition, occupation of the public rights-of-way is "necessary * * * for the proper exercise of the powers" otherwise granted to Tri-Met under ORS chapter 267. ORS 267.200(11).

Tri-Met is empowered by ORS 267.200(8) to enter into contracts with "units of local governments," defined in ORS 190.003 to include cities, to "act jointly or in cooperation with them or to provide mass transit services to areas under

---

tion for passengers or to provide for the movement of people, including park-and-ride stations, transfer stations, parking lots, malls, and skyways, provided that nothing contained herein shall limit the power of a city to exercise its general powers over or provide such stations, lots, malls, or skyways."

their jurisdictions." *See also* ORS 190.010.[12] Tri-Met is considered a "unit of local government" for the purpose of this contractual authority. ORS 267.200.

In June 1982, Tri-Met and the city entered into a "Design Services Agreement" for the LRT system. As summarized in the plaintiff utilities' complaint, those portions of the agreement dealing with relocation provide:

"A) That Tri Met will pay the City of Portland the cost of relocation of all city-owned 'conduits, lines, poles, mains, pipes and other facilities whether located within the public right-of-way or not'; and

"B) That the City of Portland 'shall cause the owners of privately-owned utility conduits, lines, poles, mains, pipes and other facilities on City streets or ways to relocate the facilities as necessary to conform to the Project, to the extent that the City has the power to do so'; and

"C) That if the City of Portland cannot cause relocation of privately-owned utilities without cost to the City of Portland or the LRT Project, Tri Met shall relocate them or cause them to be relocated as necessary for the project * * *."

The effect of the agreement is specified by ORS 190.030(1), which provides:

"When an agreement under ORS 190.010 has been entered into, the unit of local government * * * is vested with all powers, rights and duties relating to those functions and activities that are vested by law in each separate party to the agreement, its officers and agencies."

Under this statute, the agreement entered into by Tri-Met and the city vested each entity with all powers, rights and duties belonging to the other. It is without significance that the "public work" of constructing a mass transit system was actually undertaken by Tri-Met and that the relocation was ordered by the city.

We conclude that the utility companies may not recover the costs of the relocation of their facilities against

---

[12] ORS 190.010 provides:

"A unit of local government may enter into a written agreement with any other unit or units of local government for the performance of any or all functions and activities that a party to the agreement, its officers or agencies, have authority to perform. * * *"

Tri-Met or the City of Portland for the Portland segment of the light rail transit system involved in our review of this case.

The Court of Appeals is affirmed.