## NORFOLK REDEVELOPMENT AND HOUSING AUTHORITY *v.* CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF VIRGINIA
### ET AL.

No. 81–2332.   Argued October 3, 1983—Decided November 1, 1983

*Francis N. Crenshaw* argued the cause for petitioner. With him on the brief were *Howard W. Martin, Jr.,* and *Ann K. Sullivan.*

*Joshua I. Schwartz* argued the cause for the Secretary of Housing and Urban Development as respondent under this Court's Rule 19.6 in support of petitioner. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Claiborne,* and *Geoffrey I. Stewart.*

*Joseph L. Kelly* argued the cause for respondent Chesapeake and Potomac Telephone Co. of Virginia. With him on the brief was *Jack E. Greer.**

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Chesapeake & Potomac Telephone Co. of Virginia (C&P) was required to relocate some of its telephone transmission facilities by reason of a street realignment. It sought compensation from petitioner Norfolk Redevelopment

---

*Briefs of *amici curiae* urging reversal were filed for the Boston Redevelopment Authority by *William A. Zucker;* for the Community Redevelopment Agencies of the City of Los Angeles et al. by *James Dexter Clark* and *Richard E. Brandt;* for the United States Conference of Mayors et al. by *Stephen Chapple, John J. Gunther, Bronson C. La Follette,* Attorney General of Wisconsin, and *Richard B. Geltman;* for the National Institute of Municipal Law Officers by *J. Lamar Shelley, John W. Witt, Henry W. Underhill, Jr., Benjamin L. Brown, Roy D. Bates, George Agnost, James B. Brennan, Roger F. Cutler, Walter M. Powell, Frederick A. O. Schwarz, Jr., William H. Taube, William I. Thornton, Jr., Max P. Zall,* and *Charles S. Rhyne;* for the City of New York by *Frederick A. O. Schwarz, Jr.,* and *Leonard Koerner;* and for the City of Norfolk, Virginia, by *Philip R. Trapani* and *Lydia Calvert Taylor.*

Briefs of *amici curiae* urging affirmance were filed for the American Gas Association by *Kevin B. Belford;* for Brooklyn Union Gas Co. by *Dana Contratto;* and for Mountain States Telephone and Telegraph Co. et al. by *Dale G. Higer.*

and Housing Authority (NRHA), the local government agency responsible for the urban renewal plan which caused the street realignment. C&P claimed that it was a "displaced person" as that term is defined in the Uniform Relocation Act,[1] passed by Congress in 1970. We hold that C&P is not a "displaced person" within the meaning of the Act.

The Relocation Act provides that any person "displaced" from his home or place of business by a federal or federally funded project is entitled to relocation benefits, including reimbursement for the "actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property." 42 U. S. C. § 4622(a)(1). The Act by its terms binds only federal agencies; but a federal agency may not provide funds for state projects involving condemnation without first receiving "satisfactory assurances" that displaced persons will be given such relocation payments and assistance "as are required to be provided by a Federal agency" under the Act. 42 U. S. C. § 4630. In order to qualify for federal funds, therefore, many States, such as Virginia, see Va. Code § 25–235 *et seq.* (1980 and Supp. 1983), have adopted legislation modeled on the Relocation Act.

NRHA is a political subdivision of the State of Virginia, located in the city of Norfolk. During the 1960's, NRHA began four redevelopment projects in Norfolk for which federal funds were provided under the urban renewal program contained in Title I of the Housing Act of 1949, 63 Stat. 414, 42 U. S. C. § 1450 *et seq.* (1976 ed. and Supp. V).[2] The development plans approved by the city and carried out by

---

[1] The full title of the Act is the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894, 42 U. S. C. § 4601 *et seq.*

[2] Agreements were worked out between the United States Department of Housing and Urban Development (HUD) and NRHA for each of the four projects, providing that HUD would furnish two-thirds of the net project cost in cash, while the city of Norfolk would contribute the remaining one-third "in kind," by means of public improvements such as streets, schools, and parks. See Stipulation of Fact No. 9, App. 42–43; App. 187–188, 194 (testimony of Mr. Rice).

NRHA required the reshaping of certain land parcels, which in turn required a realignment of street patterns. After acquiring the land on both sides of the streets in question, NRHA successfully petitioned the city to close off those streets or parts thereof. Stipulations of Fact Nos. 5, 6, App. 39–41. New streets were constructed in accordance with the development plans.

C&P is a privately owned utility company engaged in the business of selling telephone and other telecommunication services in the city of Norfolk and throughout Virginia. To serve its customers, C&P had placed telephone transmission facilities, including manholes, conduits, cables, and accessory fittings, within the public rights-of-way of certain streets throughout Norfolk, including streets within the urban renewal project areas.[3] When the streets were realigned, C&P was forced to relocate some of its facilities. The manholes and conduits, too massive to move, were simply abandoned in place. The telephone cables were withdrawn and, for the most part, sold for their scrap value, though some cable was stored for possible reuse. App. 100–101 (testimony of Mr. Tucker). Substitute facilities were installed beneath the new streets to prevent any interruption in service.

C&P sought reimbursement from NRHA for the expenses it incurred in this relocation, claiming that it was a "displaced person" within the meaning of the Relocation Act.[4] After a

---

[3] The facilities were placed under the streets pursuant to an 1898 franchise agreement between the city and C&P's predecessor, Southern Bell Telephone Co. See Exhibit No. 1, App. 228–243. Under the terms of that agreement, the city could require C&P to move its facilities at any time, with all expenses of the move to be borne by C&P. Stipulations of Fact Nos. 10, 11, App. 43–44.

[4] Section 101(6) of the Relocation Act, as set forth in 42 U. S. C. § 4601(6), provides as follows:

"The term 'displaced person' means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate

series of administrative rejections, C&P sued NRHA in the United States District Court for the Eastern District of Virginia.[5] The District Court denied relief to C&P, but on appeal its decision was reversed by the Court of Appeals for the Fourth Circuit. *Chesapeake & Potomac Telephone Co. of Virginia* v. *Landrieu*, 674 F. 2d 298 (1982). That court held that the definitional provisions of the Relocation Act compelled the conclusion that a utility was not excluded from the definition of "displaced person" under the Act, and that C&P was entitled to compensation as a "displaced person" for the sort of expenses incurred here.

We granted certiorari to review the judgment of the Court of Appeals. 459 U. S. 1145 (1983). We now reverse. Our analysis of the statute and its legislative history convinces us that in passing the Relocation Act Congress addressed the needs of residential and business tenants and owners, and did not deal with the separate problem posed by the relocation of utility service lines. We hold, therefore, that the Relocation Act did not change the long-established common-law principle that a utility forced to relocate from a public right-of-way must do so at its own expense; it is not a "displaced person" as that term is defined in the Act.

---

real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project."

[5] After C&P was turned down by NRHA, it appealed to the Richmond office of HUD. That agency also rejected the claim and was joined as a defendant in this suit. The basis for C&P's appeal from the local agency to the federal agency is contained in a regulation issued by HUD, 24 CFR § 42.707 (1983). The statutory authorization for such appeal is unclear, but neither party questions the validity of the regulation in question, and we proceed on the assumption that such review by HUD was authorized by the Act, and that the present litigation involves only the interpretation of the relevant provisions of the Relocation Act.

There is no doubt that a utility company could, under certain circumstances, be a "displaced person" within the meaning of the Relocation Act. Businesses as well as natural persons are eligible for relocation benefits.[6] Thus, for example, if a branch office of C&P were located in a building condemned by the NRHA, C&P might well be entitled to recover the cost of moving its office equipment and furnishings. C&P, just like any other legitimate business, would be "displaced" by the federally funded project. But whether C&P can be said to be "displaced" within the meaning of the Act when it relocates telephone lines because an urban renewal project calls for realignment of existing street patterns is a different question which requires more detailed analysis. When streets containing utility conduits are realigned, C&P is not "just like any other legitimate business"; it faces a problem unique to utilities.

Under the traditional common-law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities. 12 E. McQuillin, Law of Municipal Corporations § 34.74a (3d ed. 1970); 4A J. Sackman, Nichols' Law of Eminent Domain § 15.22 (rev. 3d ed. 1981). This rule was recognized and approved by this Court as long ago as *New Orleans Gas Light Co.* v. *Drainage Comm'n of New Orleans*, 197 U. S. 453, 462 (1905) (holding that the injury sustained by the utility is *damnum absque injuria*).

It is a well-established principle of statutory construction that "[t]he common law . . . ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose." *Fairfax's Devisee* v. *Hunter's Lessee*, 7

---

[6] "Person" is defined in the Act to include "any individual, partnership, corporation, or association." 42 U. S. C. § 4601(5). The term "business" includes "any lawful activity, excepting a farm operation, conducted primarily . . . (B) for the sale of services to the public . . . ." 42 U. S. C. § 4601(7).

Cranch 603, 623 (1813).[7]  Since the elements of the federal law of eminent domain are largely derived from the common law, see, *e. g.*, *United States* v. *Miller*, 317 U. S. 369 (1943), this canon of construction has a force in this case that it might not have in other contexts of federal statutory construction. We must, therefore, be satisfied that Congress addressed the problem of utility relocation costs in the Relocation Act before we can conclude that C&P is entitled to the benefits it seeks.  "As in all cases of statutory construction, our task is to interpret the words of th[e] statut[e] in light of the purposes Congress sought to serve."  *Chapman* v. *Houston Welfare Rights Org.*, 441 U. S. 600, 608 (1979).

The passage of the Relocation Act in 1970 ended a decade of close consideration of the problems faced by persons displaced by federal and federally funded projects.  See *Alexander* v. *United States Dept. of HUD*, 441 U. S. 39, 49 (1979). The principal sponsor of the bill, Senator Muskie, noted that over 50 federal programs resulted in condemnation proceedings and that the victims of such proceedings received widely varying treatment.  "Nearly all federally assisted programs have differing, if not conflicting, provisions for helping those displaced.  They range from no assistance in some cases to liberal benefits and protection in others."  115 Cong. Rec. 31533 (1969).  In part, the Uniform Relocation Act was passed, as its name suggests, simply to ensure uniform treatment of persons displaced by condemnation.[8]

Another, equally important, purpose of the Act was to ensure that persons displaced by federal and federally funded programs would "not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."  42 U. S. C. § 4621.  Under traditional concepts of eminent domain, a homeowner would receive only the market

---

[7] See also, *Robert C. Herd & Co.* v. *Krawill Machinery Corp.*, 359 U. S. 297, 304–305 (1959); *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 437 (1907); *Shaw* v. *Railroad Co.*, 101 U. S. 557, 565 (1880).

[8] See 42 U. S. C. § 4621 (statement of purpose); S. Rep. No. 91–488, pp. 1–8 (1969); H. R. Rep. No. 91–1656, pp. 1–3 (1970).

value of his condemned house. H. R. Rep. No. 91–1656, p. 8 (1970). A tenant at will, residing or doing business at condemned premises, received nothing. *Id.*, at 12. Yet both would incur significant, perhaps devastating, expenses in moving personal property. S. Rep. No. 91–488, pp. 6–7 (1969); H. R. Rep. No. 91–1656, *supra*, at 2–3. The Relocation Act was intended to alleviate the "disproportionate injuries" suffered by such persons.[9]

In pursuit of both equity and uniformity, Congress relied heavily on prior legislation governing specific federal programs. For the relocation provisions at issue here, Congress adopted as its principal model the relocation provisions in § 501 through § 511 of the Federal-Aid Highway Act of 1968 (1968 Highway Act), Pub. L. 90–495, 82 Stat. 830–835. The legislative history is explicit that the Relocation Act was designed to extend the coverage of that pre-existing program to all federal agencies, with modifications "only as necessary to achieve a system of requirements and aids that can be applied uniformly in all Federal and federally assisted programs." S. Rep. No. 91–488, *supra*, at 2. See also H. R. Rep. No. 91–1656, *supra*, at 2; 115 Cong. Rec. 31534 (1969) (remarks of Sen. Mundt).[10] Much of the language of the

---

[9] See S. Rep. No. 91–488, *supra*, at 4, 6–7, 9; H. R. Rep. No. 91–1656, *supra*, at 3

[10] The same sources also indicate reliance on § 114 of the Housing Act of 1949, as amended by the Housing and Urban Development Act of 1968, Pub. L. 90–448, 82 Stat. 526. Section 114 made no mention of utility relocation costs, and HUD regulations promulgated under the Act specifically state that utilities have no right to reimbursement for expenses incurred when relocating to accommodate an urban renewal project. If, however, state law *requires* that such compensation be paid to the utility by the state or local agency involved in the project, then the amount paid is considered a legitimate project expenditure to which HUD will contribute its pro rata share. See HUD Urban Renewal Handbook, RHA 7209.1, ch. 2, pp. 4–5 (1969).

Section 114 was repealed by § 220(a)(5) of the Relocation Act, and HUD regulations have been extensively revised to reflect the new law. The regulation governing utility relocation costs, however, remains unchanged.

Relocation Act, including the declaration of policy,[11] the definitions of "person,"[12] "business,"[13] and "displaced person,"[14] as well as the formula for calculating relocation benefits,[15] is taken directly from the 1968 Highway Act.

In divining congressional intent, therefore, it is instructive to note that the claims made by C&P in this case would not have been countenanced under the 1968 Highway Act. Utility relocation costs necessitated by federally funded highway projects were already specifically governed by a separate provision, 23 U. S. C. § 123, which predated and was left intact by the 1968 Act. Careful consideration of this provision demonstrates that Congress considered utility relocation as a problem separate and distinct from the plight of "displaced"

---

[11] Compare § 501 of the 1968 Highway Act ("to insure that a few individuals do not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole") with § 201 of the Relocation Act, 42 U. S. C. § 4621 ("to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole").

[12] Compare § 511(1) of the 1968 Highway Act ("The term 'person' means . . . any individual, partnership, corporation, or association which is the owner of a business . . .") with § 101(5) of the Relocation Act, 42 U. S. C. § 4601(5), set out in n. 6, *supra*.

[13] Compare § 511(4) of the 1968 Highway Act ("The term 'business' means any lawful activity conducted primarily . . . (B) for the sale of services to the public . . .") with § 101(7) of the Relocation Act, 42 U. S. C. § 4601(7), set out in n. 6, *supra*.

[14] Compare § 511(3) of the 1968 Highway Act ("any person who moves from real property . . . as a result of the acquisition or reasonable expectation of acquisition of such real property, which is subsequently acquired, in whole or in part, for a Federal-aid highway . . .") with § 101(6) of the Relocation Act, 42 U. S. C. § 4601(6), set out in n. 4, *supra*.

[15] Compare § 505(a) of the 1968 Highway Act ("actual reasonable expenses in moving himself, his family, his business, or his farm operation, including personal property") with § 202(a)(1) of the Relocation Act, 42 U. S. C. § 4622(a)(1) ("actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property").

persons dealt with in the 1968 Highway Act and later, more generally, in the Relocation Act.

Title 23 U. S. C. § 123 had its origins in S. Rep. No. 1093, 83d Cong., 2d Sess., 12–13 (1954). In 1954, the Senate Committee on Public Works "heard considerable testimony from owners and operators of various public utilities concerning the heavy financial burden placed upon them when reconstruction or modernization of highways requires that their facilities be moved from their prior locations on the highway right-of-way." *Id.*, at 12. But the Committee tentatively concluded that, since the question was governed by long-established state law, it was "neither feasible nor desirable for the Federal Government to give direction to those local relationships by force of application of Federal funds." *Id.*, at 13.

The Committee did, however, authorize a study of the problem, and this study[16] led to the adoption of § 111 of the Federal-Aid Highway Act of 1956 (1956 Highway Act), Pub. L. 84–627, 70 Stat. 383. Some States had, by statute or practice, altered the common law in order to reimburse utilities for the costs of relocation. Congress felt that such reimbursement should be considered a legitimate project expense for which the Federal Government would contribute its pro rata share. Thus, § 111 provided that when a State, in accordance with state law, pays the costs of relocation of a utility necessitated by a federally funded highway project, "Federal funds may be used to reimburse the State for such cost in the same proportion as Federal funds are expended on the project." 23 U. S. C. § 123(a). The question of utility reimbursement was, thus, left to the laws of the individual States, with no congressional displacement of those laws. The House Report accompanying the 1956 Highway Act specifically stressed: "There is no requirement in this section,

---

[16] Public Utility Relocation Incident to Highway Improvement, H. R. Doc. No. 127, 84th Cong., 1st Sess. (1955).

either expressed or implied, that a State must pay all or any part of utility relocation costs." H. R. Rep. No. 2022, 84th Cong., 2d Sess., 14 (1956).

In response to the 1956 Highway Act, a number of States passed legislation providing for reimbursement of the cost of relocating utility facilities for federal-aid highway projects.[17] The Senate Committee on Public Works expressed concern over "this drastic change in existing practices," noting that "the use of Federal funds for reimbursement to the States for this purpose will increase substantially, thereby reducing the amount of Federal funds available for construction of highways." S. Rep. No. 1407, 85th Cong., 2d Sess., 28 (1958). In response, the Committee proposed to put a 70% cap on federal contributions to States for reimbursement of utilities. *Ibid.* This limitation was rejected in the final bill, however, and the only amendment to 23 U. S. C. § 123 was a proviso that reimbursement be made "only after evidence satisfactory to the Secretary shall have been presented to him substantiating the fact that the State has paid such cost from its own funds . . . ." Pub. L. 85–381, § 11(a), 72 Stat. 94–95. Thus, after careful consideration of the alternatives, the relations between utilities and the States were left, once again, to state law. No *federal* right to reimbursement was ever granted to utilities, although pro rata federal reimbursement remained available to the States if state law required reimbursement of utilities.

---

[17] "During 1956 and 1957, legislation which would provide for payment by the State of the cost of relocating public-utility facilities was considered by the legislative assemblies in 40 States. Such legislation was passed in 22 States, but was vetoed in 6 States, so it became law in 16 States. Under these 16 State laws only 1 State will pay the cost of relocating utility facilities on all State-maintained highways, 5 relate to all Federal-aid projects, and 10 relate to the projects on the Interstate System only, where the Federal share of the cost is at least 90 percent." S. Rep. No. 1407, 85th Cong., 2d Sess., 28 (1958).

As noted, the 1968 Highway Act did nothing to change this situation. Title 23 U. S. C. § 123 was left untouched. The relocation provisions in § 501 through § 511 of the 1968 Act were directed at a separate problem: the plight of those displaced from their homes or places of business. H. R. Rep. No. 1584, 90th Cong., 2d Sess., 20 (1968); S. Rep. No. 1340, 90th Cong., 2d Sess., 7 (1968). Utility relocation costs were never mentioned and, given 23 U. S. C. § 123, were clearly not intended to be covered by § 501 through § 511.

The history of the Federal-Aid Highway Act from 1954 to 1968 shows, therefore, that Congress considered utility relocation costs and the expenses incurred by "displaced persons" to be separate and distinct problems calling for separate and distinct solutions. Congress showed that it was aware of the common-law rule that utilities must bear their own relocation expenses, and it proved unwilling, after extensive consideration and debate, to federalize the relations between utilities and state and local governments.

In the Relocation Act, Congress chose to deal with only one of these two problems. In modifying and extending § 501 through § 511 of the 1968 Highway Act, Congress was addressing the needs of residential and business tenants and owners, living and working in buildings that would be bulldozed by federal and federally funded programs. 115 Cong. Rec. 31533 (1969) (remarks of Sen. Muskie) (expressing his concern at "the bulldozing of hundreds of thousands of people from their homes and businesses annually").[18] Section 220 of the Relocation Act repealed those sections of prior law that had been superseded or rendered superfluous by the Relocation Act, including § 501 through § 511 of the 1968 Highway

---

[18] See also S. Rep. No. 91–488, pp. 4, 6, 9 (1969); H. R. Rep. No. 91–1656, pp. 2–3 (1970); 115 Cong. Rec. 31534 (1969) (remarks of Sen. Mundt); *id.*, at 31534–31535 (remarks of Sen. Tydings); 116 Cong. Rec. 40167 (1970) (remarks of Rep. Edmondson); *id.*, at 40168 (remarks of Rep. Kluczynski); *id.*, at 40170 (remarks of Rep. Mink).

Act.  See H. R. Rep. No. 91–1656, pp. 21, 32–38 (1970). Yet 23 U. S. C. § 123, governing utility relocation costs occasioned by federally funded highway projects, was left intact. It was neither contradicted nor rendered superfluous because it addressed a problem outside the scope of the Relocation Act.

At no point in the extensive hearings,[19] congressional debates,[20] or Committee Reports[21] was it ever suggested that the Relocation Act would alter the state rules governing utility relocation expenses.  Given that Congress had hitherto expressly declined to alter those rules, after extensive consideration and debate, the conclusion seems inescapable that Congress did not do so in a fit of absentmindedness when it modified and extended the provisions of the 1968 Highway Act, provisions directed at a different problem.

Virginia has continuously recognized the common-law rule that a utility forced to relocate from a public right-of-way must do so at its own expense.  In *Potomac Electric Power Co.* v. *Fugate*, 211 Va. 745, 747–748, 180 S. E. 2d 657, 658–659 (1971), the Supreme Court of Virginia held that a franchise agreement, such as that between Norfolk and C&P, which allows a utility to place its facilities in public streets is revocable at will and confers no property right on the utility. Established practice under the franchise agreement between Norfolk and C&P was to the same effect.  C&P has always in the past borne all costs of relocation and has included those

---

[19] See Uniform Relocation Assistance and Land Acquisition Policies Act of 1969: Hearings on S. 1 before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 91st Cong., 1st Sess. (1969); Uniform Relocation Assistance and Land Acquisition Policies–1970: Hearings on H. R. 14898, H. R. 14899, S. 1, and related bills before the House Committee on Public Works, 91st Cong., 1st and 2d Sess. (1969–1970).

[20] See, *e. g.*, 115 Cong. Rec. 31533–31535 (1969); 116 Cong. Rec. 40163–40172, 42132–42140 (1970).

[21] S. Rep. No. 91–488 (1969); H. R. Rep. No. 91–1656 (1970).

expenses as part of its operating expenses within the rate structure approved by the State Corporation Commission. Stipulations of Fact Nos. 10, 11, App. 43–44.   We hold that the Relocation Act did not grant utilities such as C&P a new, federal right to reimbursement for expenses of the sort incurred here.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE POWELL took no part in the consideration or decision of this case.