In re WINDSOR ON THE RIVER ASSOCIATES, LTD., Debtor.

WINDSOR ON THE RIVER ASSOCIATES, LTD., Appellee/Cross–Appellant,

v.

BALCOR REAL ESTATE FINANCE, INC., now known as Balcor Real Estate Holdings, Inc., Appellant/Cross–Appellee.

Nos. 92–3712, 92–3870.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1993.

Decided Oct. 8, 1993.

---

Michael B. Solow, Chicago, IL, argued (Mark A. McDermott, on the brief), for appellant.

Stephen C. Greenberg, Atlanta, GA, argued (Howard M. Delashmit, Dan Childers, and Thomas L. Fiegen, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, and JOHN R. GIBSON and MORRIS SHEPPARD ARNOLD, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Balcor Real Estate Finance, Inc. ("Balcor"), appeals a district court confirmation of a Chapter 11 reorganization plan proposed by Windsor on the River Associates, Ltd. ("Debtor"), the debtor in this case. At issue is whether a debtor's voluntary Chapter 11 reorganization plan can be confirmed over the objections of a secured creditor holding a claim worth over 99% of the total value of the claims against the debtor's assets, when no other creditors are materially affected by the plan. We hold that confirmation under such circumstances is improper and therefore reverse.

## I.

Windsor on the River is a 298–unit apartment complex situated on 23 acres adjacent to the Cedar River in Cedar Rapids, Iowa. The property is essentially the only asset of Debtor, a limited partnership formed in 1982 for the purpose of acquiring and owning the complex. In 1987, the Debtor refinanced the loan used to purchase the property with a $9.35 million mortgage loan from Balcor. In connection with the loan, Debtor executed a note, mortgage and security agreement, and assignment of rents, in favor of Balcor. The term of the note is four years, providing for a balloon payment at maturity in May, 1991, of all unpaid principal and deferred interest.

Debtor made payments to Balcor in accordance with the terms of the note until March, 1991. During the months preceding the maturity of the loan, Debtor tried unsuccessfully to negotiate a loan extension with Balcor, or to find refinancing elsewhere. Debtor then failed to make the payments due in April and May, 1991. On May 22, 1991, five days before the maturity date of the note, the Debtor filed a voluntary petition under Chapter 11 of the bankruptcy code.

At the hearing on the Debtor's first plan of reorganization, the bankruptcy court determined the value of the apartment complex to be $10,500,000, while the amount of Balcor's secured claim at that time was determined to be $9,879,927.81. The bankruptcy court declined, however, to confirm the Debtor's initial plan, in part because of the insufficiency of the $164,141 partners' contribution called for by that plan. The Debtor subsequently amended its plan, providing for a capital contribution of $1 million.

The plan now before us, the Debtor's third amended plan, divides the creditors' claims into six classes. It designates Balcor's secured claim as Class 1. Class 4 consists of the claims of tenants for return of their tenant security deposits. The plan provides for payment of these deposits in accordance with the leases. The Class 5 and Class 6 interests are those held by the limited and general partners respectively. The total amount of all claims in the two remaining classes is less than 1% of the amount of Balcor's secured claim.

Class 2 consists of a claim held by Ms. Mary Niman in the amount of $59,249. This claim is purported by the Debtor to have arisen through a series of complex transactions, the legal effect of which is in dispute. The district court subsequently disallowed the Class 2 claim.

The final class of claims under the plan, designated Class 3, consists of the claims of several unsecured trade debts. The total amount of all claims in this class was roughly $13,000, which was originally owed to 34 creditors.

The plan of reorganization is structured so that three classes of claims—Classes 1, 2, and 3—are impaired. Under the plan, Classes 2 and 3 are scheduled to be paid 60 days after the plan's effective date. Class 1, the Balcor claim, was scheduled to be reduced by a payment of $500,000 to Balcor on the plan's effective date, funded in part by $435,000 of the partners' $1 million capital contribution. The plan also modifies the terms of the loan agreement made between

the Debtor and Balcor by extending the maturity date to 10 years after the plan's effective date. The plan calls for the Debtor to make monthly payments to Balcor consisting of principal and interest computed on a 30–year amortization schedule at an annual rate of 8.5%. At maturity, the plan calls for the Debtor to make a final balloon payment to Balcor consisting of the outstanding balance of principal and any accrued unpaid interest.

Because of the "impairment" of the Class 2 and 3 claims, Balcor feared that the plan of reorganization could meet the technical requirements for confirmation with the approval of just one of these two classes. Under 11 U.S.C. § 1129(a)(10), the plan could be confirmed over the disapproval of a creditor if the plan received the approval of "at least one class of claims that is impaired under the plan." This fear led Balcor to attempt to avoid having the reorganization plan "crammed down" its throat. Accordingly, Balcor challenged the validity of the Class 2 claim held by Ms. Niman. Then, to secure an unfavorable vote on the confirmation of the plan by Class 3, Balcor purchased a majority of the Class 3 unsecured trade claims and attempted to cast or change the votes accompanying these claims to deny confirmation.

At the confirmation hearing on the third amended plan, the district court denied Balcor the right to vote as claims assignee of the unsecured trade creditors, in part because 13 of the votes had been cast before Balcor had acquired the claims. As a result, the Class 3 unsecured trade creditors were deemed by the district court to have approved the plan, providing the impaired claim approval required for a "cramdown."

The district court confirmed the plan over Balcor's objections. Balcor appealed the confirmation of the plan on the grounds that the plan was not approved by at least one class of impaired creditors as required by 11 U.S.C. § 1129(a)(10). The Debtor cross-appealed on the district court's decision to disallow the vote cast by the Class 2 claimant, Ms. Niman.

II.

Bankruptcy is a creature of statute. Applications of the bankruptcy code must, therefore, be consistent with long established canons of statutory construction. One such established maxim is that "the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). While the language is the starting point, it is equally true that it is the task of federal courts when engaging in statutory construction " 'to interpret the words of th[e] statut[e] in light of the purposes Congress sought to serve.' " *Norfolk Redevelopment & Housing Authority v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 36, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983), quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). Accordingly, "we must avoid statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress." *In re Oxborrow*, 913 F.2d 751, 754 (9th Cir.1990).

Confirmation of the Debtor's plan of reorganization in this case is governed by 11 U.S.C. § 1129, which provides that:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> \*     \*     \*     \*     \*     \*
>
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

Under 11 U.S.C. § 1124(1), a class of claims is "impaired" under a plan of reorganization unless, with respect to each claim in the class, the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." By this standard, any alteration of a creditor's rights, no matter how minor, constitutes "impairment." The central question presented by the instant case is whether such impairment may be manufactured at the will of the debtor "just to stave off the evil day of liquidation."

Richard A. Posner, *Economic Analysis of Law* 378 (3rd ed. 1986). We think that the answer is no.

To allow manipulation of claims in a reorganization proceeding under Chapter 11 would be contrary to the purpose of the provisions of the bankruptcy code. Section 1129(a)(10) was created in 1984 to protect lenders from the potential inequities of the "cramdown" provisions of the Bankruptcy Act. *See* Peter E. Meltzer, *Disenfranchising the Dissenting Creditor through Artificial Classification or Artificial Impairment,* 66 Am.Bankr.L.J. 281, 311–12 (1992). Under the original section 461 of the act, a plan of reorganization for real property could be confirmed so long as the mortgagee received the appraised value of the subject property. 11 U.S.C. § 861 (repealed 1978). The act was amended to address the concerns of lenders that in a depressed real estate market, a cash payment equal to the amount of the market value of the property would "prevent the creditor from recovering the full debt in the event of improved real estate conditions," even though "the creditor would belong to an unimpaired class and would thus be deemed to accept the plan." *In re Polytherm Industries, Inc.,* 33 B.R. 823, 834 (W.D.Wis.1983). The structure of this provision imposed "the entire risk of under-valuation by the bankruptcy court on the secured creditor and permits the debtor to receive all of the benefits of future appreciation of the property." *In re 222 Liberty Assoc.,* 108 B.R. 971, 979 n. 6 (Bankr.E.D.Pa.1990).

■ To curb the inequities of such reorganization plans being "crammed down" the throat of secured lenders, Congress enacted section 1129(a)(10). The purpose of the section "is to provide some indicia of support by affected creditors and prevent confirmation where such support is lacking." *In re Lettick Typografic, Inc.,* 103 B.R. 32, 38 (Bankr. D.Conn.1989). Since Chapter 11 is designed to promote consensual reorganization plans, a proposal that has no support from impaired creditors cannot serve its purpose. It would be odd if an amendment designed to give secured creditors more protection were used as the means to rewrite their credit agreements without their consent. Confirmation of a plan where the debtor engineers the impairment of the only approving impaired class "so distorts the meaning and purpose of [section 1129(a)(10) ] that to permit it would reduce (a)(10) to a nullity." *Id.*

■ This court has dealt with the closely related problem of artificial classification under section 1129(a)(10). In *In re Lumber Exchange Building Ltd. Partnership,* 968 F.2d 647 (8th Cir.1992), we held that artificial classification of claims in order to achieve literal compliance with section 1129(a)(10) is improper under the code. In that case, the debtor partnership attempted to gain confirmation of its Chapter 11 reorganization plan over the objections of its undersecured mortgage lender. The debtor had classified the unsecured portion of the lender's claim separately from the unsecured trade claims. The court affirmed the bankruptcy court's dismissal of the case, holding that the only purpose to be served by such facially improper classification was to ensure that at least one impaired class of claims would approve the plan. *Id.* at 650.

It appears that the problems of artificial impairment and artificial classification have much in common. Artificial classification tends to arise where the principal creditor in a single-asset reorganization is undersecured. The extent to which the creditor's claim exceeds its security interest in the single asset of the debtor should be treated, absent the debtor's manipulation, as unsecured credit, and classified with the rest of the unsecured creditors. To achieve "cramdown" under section 1129(a)(10), however, many debtors have attempted to classify the often large unsecured portion of the principal creditor's claim separately from small unsecured trade claims. This is done to prevent the principal creditor from blocking approval of the debtor's plan, which a slightly impaired class of trade claimants might be persuaded to give, in light of the alternative specter of liquidation. *See In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346 (5th Cir.1989); *see also* Meltzer, *Disenfranchising the Dissenting Creditor,* 66 Am.Bankr.L.J. at 281.

Similarly, artificial impairment has arisen most commonly in single-asset reorganizations. The difference is that the debtor is

dealing with an oversecured, rather than undersecured, creditor. Because the lender is oversecured, there is no unsecured portion of the claim to classify along with the unsecured trade creditors. The problem, however, is that the approving class of unsecured trade claimants must hold impaired claims. Impairment in such cases is more difficult, since the value of the asset exceeding the secured claim is often sufficient to satisfy the much smaller unsecured trade claims in full. *See* Meltzer, *Disenfranchising the Dissenting Creditor,* 66 Am.Bankr.L.J. at 283.

The possible effects of confirmation under such circumstances are somewhat unsettling. Confirmation might encourage similarly situated debtors to view the bankruptcy code as an alternative to refinancing. First, debtors with projects lacking the fiscal promise necessary to gain refinancing on the open market might resort to section 1129(a)(10) as the mechanism by which they might draft their own loans from existing lenders. Second, the very threat of such an alternative might coerce lenders into extensions of credit terms that might otherwise not be called for by market conditions.

■ Finally, such an outcome would directly undermine one of the primary functions of bankruptcy law: to discourage "side dealing" between the shareholders of a corporation and some creditors to the detriment of other creditors. *See* Posner, *Economic Analysis of Law* 375. A similarly situated debtor, with the knowledge that impairment under section 1129(a)(10) might be manufactured, would be encouraged to make arrangements with small, unsecured creditors, and to seek their approval when a plan is filed that leaves their interests only marginally affected. It is exactly such "side dealing" that prompted the adoption of a bankruptcy code, and to allow it would defeat "'the purposes Congress sought to serve.'" *Norfolk Redevelopment,* 464 U.S. at 36, 104 S.Ct. at 307, quoting *Chapman,* 441 U.S. at 608, 99 S.Ct. at 1911. Accordingly, we hold that, for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion.

### III.

■ When applying this analysis to the case now before us, it appears that the district court erred in confirming Debtor's plan, because no impaired class of creditors approved it. Confirmation of Debtor's plan in this case suffers from an infirmity similar to that in *In re Lumber Exchange.* In that case, the debtor artificially classified the unsecured portion of the mortgage lender's claim separately from the claims of the unsecured trade creditors in the hope of achieving "cramdown." *In re Lumber Exchange,* 968 F.2d at 650. Here, Debtor had no need to classify claims artificially to achieve its purpose. Debtor in the instant case had a reasonable basis for classifying the Balcor loan separately from the trade debt because it was secured. The difficulty, however, is that the separate, approving class must also be "impaired." One such impairment might be a delay in payment. Debtor proposed a plan that delayed payment to the trade creditors for 60 days after the effective date. If this impairment has been manufactured, then the plan must be regarded as having circumvented the purpose of the statute, namely, consensual reorganization.

■ Whether Debtor manipulated the terms of its plan for purposes of securing confirmation is a question of fact. Findings of fact made by the district court should not be disturbed unless determined to be clearly erroneous. *In re LeMaire,* 898 F.2d 1346, 1349–50 (8th Cir.1990) (*en banc* ); *In re Ark. Communities, Inc.,* 827 F.2d 1219, 1221 (8th Cir.1987). We believe, however, that the trial court clearly erred when it determined that the Class 3 claims were impaired.

The face of Debtor's third amended plan of reorganization clearly shows that the unsecured trade creditors' claims of Class 3 and the disallowed Class 2 claim were arbitrarily and artificially impaired. Simple remanipulation of the plan demonstrates this. Had Debtor's plan allowed for a smaller payment to Balcor, say, $400,000 instead of $500,000, Debtor could have paid both the Class 2 and Class 3 claimants on the effective date. Balcor would have been the only impaired claimant. As the only impaired claimant, and as a

secured claimant, it is likely that Balcor would have rejected Debtor's plan. *Compare In re Lettick Typografic, Inc.*, 103 B.R. at 38. Oddly, Balcor was placed in the position of possibly having to argue that it should receive *less* under the plan in the hope that its interests might be protected. The only purpose to be served by the delay in payment to the Class 2 and Class 3 claimants was, therefore, to ensure approval by at least one "impaired" class as required by section 1129(a)(10). Debtor never presented a plausible alternative explanation.

Once the arbitrary manipulation of claims is exposed, Balcor becomes the only creditor whose claim is impaired. Accordingly, confirmation of the plan without Balcor's approval was improper. 11 U.S.C. § 1129(a)(10). It is not necessary, therefore, to decide the issues of whether Balcor properly acquired and voted the unsecured trade claims, whether Balcor acted in bad faith, whether the plan was fair, equitable, and feasible, whether the amount of post-petition interest was proper, or whether the District Court erred in disallowing the Class 2 claim of Ms. Niman.

## IV.

■ The final issue for resolution is whether Debtor can propose a confirmable plan. A federal court sitting in bankruptcy is free to dismiss a Chapter 11 case where the debtor cannot propose a confirmable plan. *In re Lumber Exchange*, 968 F.2d at 650. Dismissal is proper if it is "in the best interest of creditors and the estate." 11 U.S.C. § 1112(b). Balcor's claim appears to be completely secured by the Debtor's only asset, the apartment complex. Since the value of the complex exceeds Balcor's investment, Balcor would undoubtedly prefer a foreclosure proceeding to any plan of reorganization. It is therefore unlikely that Balcor would accept any plan Debtor might propose.

Since it is apparent that there is no plan Debtor could propose which the only impaired creditor, Balcor, would approve, remand for further proceedings would be futile.

* Arnold, Chief Judge, McMillian and Morris Sheppard Arnold, Circuit Judges, would grant the

Accordingly, the cause is reversed and dismissed.