NORTHCUTT, Judge.
Several years ago the City of Cape Coral began a construction project to rework an intersection. The plan required the expansion of an existing road into a public utility easement where Lee County Electric Cooperative (“LCEC”) had placed its electric lines. Thus, LCEC was forced to relocate its lines to another public utility easement. The parties disagreed about which of them was responsible for shouldering the relocation expense, but they agreed that the City would file a declaratory judgment action to resolve the dispute.
In the declaratory judgment proceeding, the City and LCEC filed cross-motions for summary judgment. The circuit court determined that the facts were. undisputed, and it ruled in the City’s favor based on the franchise agreement between the parties and on section 337.403(1), Florida Statutes (2005). Our review of the summary judgment is de novo. Suncoast Auto Ctr., Inc. v. Consol. Prop. & Cas. Ins. Co., 880 So.2d 728, 730 (Fla. 2d DCA 2004). We reach the same resolution as the circuit court, albeit by slightly different reasoning.
The public utility easement containing LCEC’s electric lines came into being when Cape Coral was being planned and developed in the 1960s. The developer’s plats for the new community included a six-foot public easement at the foot of virtually every property by stating: “The owners of this property do hereby dedicate EASEMENTS along each boundary of each home site for County drainage purposes, and for Public Utilities, said easements not to exceed six feet each side of said boundaries, unless otherwise shown.” Before the subdivisions were built, LCEC began installing its electric lines and other equipment in these public utility easements.
After Cape Coral was incorporated in 1970, LCEC and the City entered into a franchise agreement that granted LCEC the “right, privilege and franchise to construct, maintain and operate an electric utility in, over, upon, under and across present and future streets, alleys, avenues, easements for public utilities, highways, bridges, and other public places of the City of Cape Coral, Florida.” In exchange, LCEC agreed to pay the City three percent of its revenues. The agreement was amended in 1986, but for our purposes the material terms were unchanged.
Neither the original nor the amended franchise agreement assigned responsibility for the cost of moving LCEC’s equipment if required to do so by the City. The only paragraph in the agreement that discussed equipment relocation provided that *128 “when any portion of a street is excavated by [LCEC] in the location or relocation of any of its facilities,” LCEC must, at LCEC’s cost, put the street back together in “as good condition as it was at the time of such excavation.” That provision did not apply here because LCEC did not excavate a street when it was required to move its lines from the easement, nor has the City sought reimbursement for the cost of street repair. But even though the franchise agreement does not specifically address relocation costs, it is central to this case. As the parties recognize, and as the affidavits filed in the declaratory action establish, the agreement is the source of LCEC’s right to continue using the public utility easements.
LCEC has advanced a number of arguments why the circuit court’s decision in this case was wrong. We address its contentions under two broad categories.
I. Taking of property without just compensation.
As a preliminary matter, we note that this case does not involve the appropriation or destruction of LCEC’s physical property, such as electric poles or lines. What has been taken, according to LCEC, is its right to run electric lines through a specific public utility easement. LCEC maintains that this was a compensable property interest and that the City took it without paying compensation, contrary to the Fifth Amendment to the United States Constitution (as applied to the states by the Fourteenth Amendment) and article X, section 6, of the Florida Constitution.
The United States Supreme Court rejected this very argument just over a century ago in New Orleans Gaslight Co. v. Drainage Commission of New Orleans, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831 (1905). In that case, the gas company had been granted the exclusive right to provide gas service to the citizens of New Orleans, and it was permitted to lay its pipes in the public ways and streets. Thereafter the city promulgated a plan for drainage, which required the gas company to move some of its pipes. Id. at 454, 25 S.Ct. 471. New Orleans Gaslight asserted that because it had acquired the franchise and availed itself of the right to install pipes under the city streets, it had acquired a property right and the location of its pipes could not be shifted without compensation for the resulting expense. Id. at 459, 25 S.Ct. 471.
The Supreme Court had earlier determined that if the city wanted to terminate its agreement giving the gas company the exclusive right to provide gas services, it would have to take that right by eminent domain. New Orleans Gas-light Co. v. La. Light & Heat Producing & Mfg. Co., 115 U.S. 650, 673, 6 S.Ct. 252, 29 L.Ed. 516 (1885). But in its 1905 decision the Court observed that nothing in that agreement gave the gas company the right to place its pipes in any particular location within the city. Moreover, the agreement provided that the company’s pipes were to be laid in the public ways and streets “in such manner as to produce the least inconvenience to the city or its inhabitants.” Drainage Comm’n, 197 U.S. at 454, 25 S.Ct. 471. The Court pointed out that in its prior decision sustaining the gas company’s exclusive right to provide gas “there was a distinct recognition that the privilege granted was subject to proper regulations in the interest of the public health, morals, and safety.” 197 U.S. at 459, 25 S.Ct. 471 (citing New Orleans Gas-light, 115 U.S. at 671, 6 S.Ct. 252). That police power could not be contracted away. Id. at 460, 25 S.Ct. 471. The Court explained:
It would be unreasonable to suppose that in the grant to the gas company of the right to use the streets in the laying *129 of its pipes it was ever intended to surrender or impair the public right to discharge the duty of conserving the public health. The gas company did not acquire any specific location in the streets; it was content with the general right to use them; and when it located its pipes it was at the risk that they might be, at some future time, disturbed, when the state might require for a necessary public use that changes in location be made.
Id. at 461, 25 S.Ct. 471. The Supreme Court held that New Orleans used its police power for a necessary purpose, a drainage plan, and in doing so it became necessary for the gas company to move some of its pipes. Complying with the city’s requirement at its own expense did not result in a taking of New Orleans Gaslight’s property. Id. at 462, 25 S.Ct. 471. See also Grand Trunk W. Ry. Co. v. City of S. Bend, 227 U.S. 544, 553, 38 S.Ct. 303, 57 L.Ed. 633 (1913) (noting that while a franchise agreement between the railway company and the city was a contract that could not be impaired, the city’s police power gave it ample authority to make regulations necessitating changes to crossings, grades, and other uses of the franchise).
This rule may not obtain when the utility’s equipment is placed in a private easement that the utility purchased from a property owner, rather than pursuant to a franchise agreement that allows the utility to use public property. See Panhandle E. Pipe Line Co. v. State Highway Comm’n of Kan., 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090 (1935) (noting that the gas company had purchased easements from the property owners to run pipes and stating that the taking of such a private right-of-way without compensation violates the Fourteenth Amendment); City of Grand Prairie v. Am. Tel. & Tel. Co., 405 F.2d 1144 (5th Cir.1969) (holding that where telephone lines were in a private easement purchased and owned by the utility, the utility was entitled to compensation for a taking under the Texas Constitution when a governmental entity required it to change the location of its cables); cf. Op. Att’y Gen. Fla. 59-80 (1959) (“Where the public utility owns real property, either in fee or a leasehold, upon which it has utility facilities, before the same may be taken and used by the state, or a county or district, the same must be acquired by purchase or eminent domain, or otherwise.”).
That was not the case here. LCEC’s lines were within an easement that had been dedicated to the public for the purpose of furnishing utilities. As such, its administration was entrusted to the local governing body with jurisdiction over the land described. See § 177.10, Fla. Stat. (1969).[1] At the time of the dedication, that governing body would have been the board of county commissioners of Lee County. See Pasco Cnty. v. Johnson, 67 So.2d 639, 642 (Fla.1953) (observing that an offer to dedicate could be accepted by the board of county commissioners as “chief administrative officers of *130 the county”)- When the City was incorporated, it became the governing body with jurisdiction over the land described in the plat.
In this appeal, LCEC has argued that its placement of equipment in the easement prior to the City’s existence imbued it with a vested private property interest that was superior to the City’s authority over the easement. It cites no authority for that proposition. Indeed, the notion that simply by using a public easement for its intended purpose the user gains a private interest that supersedes the rights of the public at large is antithetical to the very concept of dedications for public use.[2] The public nature of this easement was not altered either by LCEC’s use or by the fact that responsibility for it passed to a newly incorporated governing body.
In short, when the instant dispute arose, LCEC’s use of a particular public utilities easement was governed by its franchise agreement with the governing body that had jurisdiction over the local public lands, ways and easements, i.e., the City of Cape Coral. As such, that use was subject to the exercise of the City’s police power in the interest of public safety. See Drainage Comm’n, 197 U.S. at 459, 25 S.Ct. 471 No one contends that the City attempted to revoke the franchise. Accordingly, we reject LCEC’s contention that its property was taken without compensation in violation of the United States and Florida constitutions.
II. The common law and section 337.403.
Under the common law, “utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities.” Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va., 464 U.S. 30, 35, 104 S.Ct. 304, 78 L.Ed.2d 29 (1983) (citing 12 E. McQuillin, The Law of Municipal Corporations § 34.74a (3d ed. 1970)[3]; 4A Nichols, The Law of Eminent Domain § 15.22 (J. Sackman rev. 3d ed. 1970); Drainage Comm’n, 197 U.S. at 462, 25 S.Ct. 471). This rule stems from the conditional nature of a utility’s right to locate its facili ties in a public right-of-way. 12 McQuillin, Mun. Corp. § 34.92 (rev. 3d ed. 2010) (stating that “it is generally held that the municipality may require a change in the location of pipes or other underground facilities of the grantee of a franchise, where public convenience or security require it”). See generally Michael L. Stokes, Moving the Lines: The Common Law of Utility Regulation, 45 Val. U. L. Rev. 457 (Winter 2011). Although the rule is most commonly couched in terms of utilities placed in public streets, the policy behind the rule is much more expansive. Indeed, in Drainage Commission, 197 U.S. at 460, 25 S.Ct. 471, the Court broadly pronounced that “[rjights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety.”
Of course, the common law rule must govern unless another arrangement is dictated by the agreement between the government entity and the utility, or by *131 statute. As mentioned, in this case the franchise agreement did not address the expense of relocating LCEC’s lines in these circumstances. But, like the agreement in Drainage Commission, this one provided that LCEC’s “facilities shall be so located or relocated and so erected as to interfere as little as possible with traffic over said streets, alleys, bridges and public places, and with reasonable egress from and ingress to abutting property.” Thus the agreement impliedly recognized the City’s obligations to its citizens and its power to protect and act in the interest of the public health and safety. Certainly, improving conditions on a public street to ensure public safety is within a municipality’s police power. Under the agreement the City did not grant LCEC an unfettered right to remain in the easement of its choosing, nor did it agree to pay costs if relocation from a specific easement became necessary. In other words, the terms of this franchise agreement did not alter or qualify the common law principle described in Drainage Commission and Norfolk Redevelopment, i.e., that the utility must pay relocation costs when the governing body needs the public space where the utility has located its equipment for a public purpose.
Neither has the common law rule been altered by Florida statute. To the contrary, insofar as roads are concerned, the statute cited by the circuit court actually codifies the common law:
(1) Any utility heretofore or hereafter placed upon, under, over, or along any public road or publicly owned rail corridor that is found by the authority to be unreasonably interfering in any way with the convenient, safe, or continuous use, or the maintenance, improvement, extension, or expansion, of such public road or publicly owned rail corridor shall, upon 30 days’ written notice to the utility or its agent by the authority, be removed or relocated by such utility at its own expense except as provided in paragraphs (a), (b), and (c).
§ 337.403(1).
LCEC contends that the statute does not govern this case because the utilities were not located in a public roadway. Bather, they were in a public utility easement that was next to the affected road. No Florida cases interpreting the statute or its predecessor address the situation presented here. But a 1997 Attorney General’s opinion offers some guidance. See Op. Att’y Gen. Fla. 97-36 (1997).
In that instance, the City of Cape Coral posed three questions to the Attorney General, two of them concerning the same franchise agreement at issue in this case and the cost of relocation pursuant to section 337.403.
1. Does a franchise agreement allowing a public utility to locate on a public easement with no provision for liability for relocation expenses preclude the application of section 337.403, Florida Statutes, when the city requires relocation?
2. Does section 337.403, Florida Statutes, apply to the relocation of all utilities or only those placed on easements or rights-of-way granted by the governing body?
The Office of the Attorney General answered the first question in the negative. It then discussed the application of section 337.403, noting that the operative word in the statute was “road” and looking to section 334.03(23) of the Transportation Code for a definition of that term. The pertinent portion of this statutory definition provides that a “road” is “a way open to travel by the public including, but not limited to, a street, highway, or alley. The term includes associated sidewalks, the roadbed, the right-of-way.” See § 334.03(23), Fla. Stat. (1997). The Attor *132 ney General noted that the Transportation Code also defined a “right-of-way” as land in which a “municipality owns the fee or has an easement devoted to or required for use as a transportation facility.” § 334.22. In his opinion, “section 337.403 applies only to roads and adjacent rights-of-way owned by a governing body in fee or in which the governing body has an easement.”
We are not bound by an Attorney General’s opinion, but even if we accept the reasoning of this one, it does not answer the question presented in this case. The Attorney General defined a road for purposes of section 337.403, and we doubt that either the City or LCEC would dispute that roads exist in the intersection expanded in this case. But the statute addresses utilities “placed upon, under, over, or along” a road. It is undisputed that LCEC’s equipment was located in a six foot wide easement that bordered the public road. We have found no cases interpreting the “along” the road portion of the statute,[4] but the language of section 337.403 is clear. The utility lines at issue here were located “along” the road and they were “interfering” with the City’s “expansion” of the road. Under these facts, the statute’s plain terms required LCEC to pay the costs to relocate its lines to a different public utility easement.[5]
But even if section 337.403 did not apply, LCEC would still be required to bear the relocation costs under the common law rule. The Florida Supreme Court embraced that rule at least as early as 1906, when it held that a utility’s right to occupy the streets and public ways under a franchise are subordinate to the rights of the public and to the protection of the public health, safety, and convenience. Anderson. v. Fuller, 51 Fla. 380, 41 So. 684, 688 (1906). And in Southern Bell Telephone & Telegraph Co. v. State ex rel. Ervin, 75 So.2d 796 (Fla.1954), the court referenced treatises that recited the common law rule. Id. at 800 (citing 52 Am. Jur. 64 § 34, which explained that if telephone lines materially interfere with or obstruct public use of a street, or work to permanently improve the street, the utility “may be required to remove temporarily and reset its poles at its own expense, since franchise rights of these companies are subordinate to those of the public,” and McQuillin § 34.77 (now § 34.92, quoted supra )).
We conclude by addressing this court’s opinion in Pinellas County v. General Telephone Co. of Florida, 229 So.2d 9 (Fla. 2d DCA 1969), a case much bandied by the parties both in this court and the circuit court. General Telephone had placed its lines in an alley pursuant to a franchise agreement with the City of St. Petersburg, the terms of which were not detailed in this court’s opinion. Pinellas County obtained title to the alley, by purchase or condemnation, in order to build a judicial *133 building. This court’s opinion broadly stated that the franchise agreement between the city and the telephone company gave General Telephone a property right that could not be taken without compensation under the Florida or federal constitutions.
We cannot say whether this statement was correct under the holding of Drainage Commission because we cannot discern from the opinion whether the telephone company was claiming a right to compensation for the loss of its franchise or merely for the cost of moving its lines. See id. at 9 (stating the utility alleged “that the County’s attempt to eliminate General Telephone’s franchise and force it to relocate its facilities ” was a constitutional violation (emphasis added)). The allegation concerning the elimination of the franchise may have been grounded in the fact that the entity ordering the utility to move its equipment, Pinellas County, was not the entity with which the utility had a franchise agreement, the City of St. Peters-burg. Perhaps the county was interfering with General Telephone’s franchise itself, making the case more similar to New Orleans Gas-light, 115 U.S. 650, 6 S.Ct. 252, than to Drainage Commission, 197 U.S. 453, 25 S.Ct. 471. We can only speculate because the opinion did not contain sufficient facts for us to be certain. Moreover, the opinion did not recite any of the terms of the franchise agreement; it may be that the City of St. Petersburg granted General Telephone the right not to be displaced in the location of its lines. Because of these uncertainties, that case cannot guide our decision here.[6]
We affirm the decision of the circuit court.
KELLY and BLACK, JJ., Concur.

. When the subject plat was recorded, section 177.10 provided that a plat could be recorded only after it had a certificate of approval by the local "county commissioners, town board, or council, or the board of commissioners (in municipalities having a commission form of government) or their accredited representatives, having jurisdiction over the land described in the said map or plat.” Such approval did not bind the local government to "open up and keep in repair any parcels dedicated to the public in any map or plat so offered, but they may exercise such right at any time.” Id. (emphasis added). In 1971 the legislature repealed section 177.10 as part of a general revision of the statutes governing plats. Ch. 71-339, § 3, at 1548, Laws of Fla. Provisions similar to those in former section 177.10 are now found in section 177.081.

. To the contrary, in the absence of a formal acceptance by the local governing body, LCEC’s use of the easement could have been deemed an acceptance of the dedication on behalf of the public. See Hughes v. Town of Mex. Beach, 455 So.2d 566, 567 (Fla. 1st DCA 1984) (noting that the acceptance of a dedication may be by formal action of a governing body or by implication from the actual use of the property by the public).

. Now numbered as § 34.91.

. LCEC contends that language in the 1959 Attorney General’s opinion mentioned supra, 59-80, establishes that section 338.19, Florida Statutes (1959) — the predecessor to section 337.403 — applies only to utilities that located their facilities "over, on, or under" public roads. The opinion did not address the issue presented in this case, and it ignored the language of section 338.19, which, like the present statute, pertained to utilities “placed upon, under, over, or along any public road.” Opinion 59-80 is unpersuasive on this issue.

. The legislature amended section 337.403 in 2012. Ch. 12-174, § 35, at 2231-33, Laws of Fla. That amendment does not apply in this case, but it adds support to our decision that LCEC must pay the costs of relocation. For the first time, the statute contemplates a situation in which the government entity may bear the relocation costs. § 337.403(1)(g), Fla. Stat. (2012). Previous versions of the statute recognized no authority of a municipality to assume responsibility for those costs.

. Notably, in the only other decision that discusses or even cites to General Telephone, the court rejected a utility’s assertion that it could not be required to bear the expense of moving its telephone and cable lines from public rights-of-way in order to accommodate a municipal redevelopment project. Qwest Corp. v. City of Chandler, 222 Ariz. 474, 217 P.3d 424 (2009). In that case the court was unpersuaded by the utility's reliance on General Telephone, terming that decision "aberrational.” Id. at 431 n. 5.